MARION R. YAGMAN
STEPHEN YAGMAN
YAGMAN & YAGMAN & REICHMANN
723 Ocean Front Walk
Venice Beach, California 90291-3212
(310) 452-3200

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| GENERAL STEEL DOMESTIC SALES, L.L.C. d/b/a GENERAL STEEL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN W. SUTHERS, KENNETH SALAZAR, JAN M. ZAVISLAN, MARIA E. BERKENKOTTER, JAY SIMONSON, ANDREW P. McCALLIN, MIKE LANGLEY, BRIAN L. LAUGHLIN, JAN SCULLEY, JUSTIN PUERTA, LANCE McHENRY, DENVER BOULDER BETTER BUSINES BUREAU, d/b//a DENVER/BOULDER BETTER BUSINESS BUREAU, JEAN HERMANN, MATTHEW FEHLING, CARRIE KING ROSSMAN, JOE TOSCANO, TONY KING, HOPE MARIE DUNLAVEY, DARREL VESSELS, MARK RENN, LARRY DUDMAN, GETA ASFAW, BOWEN | No.   CV<br><br>**COMPLAINT**<br><br>(02-26-06)<br><br>(CIVIL RIGHTS, 42 U.S.C. § 1983, AND RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS [RICO], CLAIMS FOR DAMAGES, 18 U.S.C. 1961, *ET SEQ.*)<br><br>**DEMAND FOR JURY** |

1

BANBURY, DWIGHT BROWN,
JANICE CAMPBELL, JOE CONRAD
BARBARA GRIMM,
BRECKENRIDGE GROVER,
MARK JOHNSON, JERALD
KAISER. DONLEE LANE, TAMELA
LEE, JEFF METZ, DEAN
PISCIOTTA, JON ROBINSON,
STEVEN SALTER, DAVID SMITH
BILL STEVENSON, HOPE MARIE
DUNLAVEY, BARBARA GRIMM,
JERALD KAISER, TONY KING,
DWIGHT BROWN, TOTI
CADAVID, JANICE CAMPBELL,
TAMELA LEE, MARK RENN,
SUZANNE SHAW, JUDITH SPIRES,
BILL STEVENSON, DEBORAH
WIEST, BARBARA GRIMM,
DARREL BROWN, STEVE
BUDNACK, TOTI CADAVID,
JANICE CAMPBELL,
JOE CONRAD, ROB NAISH, RESSIE
PATE, DEAN PISCIOTTA, MARK
RENN, CRAIG REYNOLDS, JON
ROBINSON, STEVEN SALTER,
ALLAN SERVICE, SUZANNE
SHAW, BILL STEVENSON,
COUNCIL OF BETTER  BUSINESS
BUREAUS, INC., KENNETH J.
HUNTER, CHIP YOST, GANNETT
CO., INC., STEELWISE, LLC.,
HAROLD G. DONAHUE, TIMOTHY
MCKENNA, PATRICIA MADRID,
ANITA WOLFF, DANA BEERS, SUE
BEERS, KIRK JARVIS and ONE
HUNDRED UNKNOWN NAMED
DEFENDANTS,

                    Defendants.

Plaintiff, on information and belief, makes the following allegations in support of this complaint:

### JURISDICTION AND VENUE

1.  The claims made herein are asserted pursuant to 42 U.S.C. § 1983 and 18 U.S.C. 1961, *et seq.*, and the jurisdiction of the court is invoked pursuant to 28 U.S.C. 1331.

2.  A substantial part of the events giving rise to the claims occurred in this federal district, in Sacramento, California, and therefore venue lies in this District pursuant to 28 U.S.C. 1391.

### THE PARTIES

3.  Plaintiff was within the jurisdiction of the United States of America at all times herein alleged.  Specifically, plaintiff General Steel Domestic Sales, L.L.C. d/b/a General Steel Corporation ("GENERAL STEEL") is a Colorado limited liability company, with its principal place of business located in Lakewood, Colorado.

4.  Defendant Jan Scully ("Scully") is the District Attorney of Sacramento County and was, at all relevant times herein, the employer of the following individuals: Ruth Young ("Young"), Justin Puerta ("Puerta"), and Lance McHenry ("McHenry").  Young is a County of Sacramento deputy district attorney, Puerta is

a former County of Sacramento deputy district attorney, McHenry is an

investigator employed by the County of Sacramento District Attorney's office, and

at all relevant times herein, said defendants resided in the County of Sacramento,

in the State of California.

5.   John W. Suthers ("Suthers') is the Attorney General for the State of

Colorado and was, at all relevant times herein, employer of the individuals

contained within this paragraph, except for Ken Salazar; Ken Salazar is a former

Attorney General for the State of Colorado and was, at all relevant times herein,

the employer of all of the following individuals: Jan Zavislan ("Zavislan"), Maria

Berkenkotter ("Berkenkotter"), Jay Simonson ("Simonson"), Andrew McCallin,

("McCallin"), Mike Langley ("Langley") and Brian Laughlin ("Laughlin").

Zavislan is the Deputy Attorney General, Consumer Protection Section,

Berkenkotter is the first deputy attorney general; and Simonson and McCallin are

deputy attorneys general for the State of Colorado.  Langley is an investigator for

the State of Colorado, and at all relevant times herein said defendants resided in

Denver, in the State of Colorado.  Brian Laughlin is a legal assistant or paralegal

employed in the Consumer Protection Section of the Colorado Department of Law.

6.   The Denver Area Better Business Bureau, d/b/a Denver/Boulder Better

Business Bureau ("D/B BBB") is a Colorado § 501(c)(6) business membership

organization located in Denver, Colorado, and Jean Hermann ("Herman"),

4

Matthew Fehling ("Fehling"), Carrie King Rossman ("Rossman"), and Joe

Toscano ("Toscano") were and/or are officers and employees of the D/B BBB, and

at all relevant times, King, Herman, Rossman and Toscano were and/or are

residents of the State of Colorado

7.  In 2003, Tony King was the D/B BBB board of directors' chair, Hope

Marie Dunlavey was its vice-chair, Darrel Vessels was its treasurer, Mark Renn

was its secretary, Larry Dudman was its immediate past chair and education

foundation chair, and Jean Herman sat ex-officio with a vote.  Members at large of

the D/B BBB board of directors were Geta Asfaw, Bowen Banbury, Dwight

Brown, Janice Campbell, Joe Conrad, Barbara Grimm, Breckenridge Grover, Mark

Johnson, Jerald Kaiser, Donlee Lane, Tamela Lee, Jeff Metz, Dean Pisciotta, Jon

Robinson, Steven Salter, David Smith, Bill Stevenson, and Deborah Wiest.   On

information and belief, at all relevant times, each of said board of directors

members resided in the State of Colorado.

8.  In 2004, Hope Marie Dunlavey was the D/B BBB board of directors

chair, Barbara Grimm, was its vice-chair, Jerald Kaiser was treasurer, Bowen

Banbury was its secretary, Tony King was past chair, and Jean Herman was

president and chief executive officer.  Members at large of the D/B BBB Board of

Directors were Geta Asfaw, Dwight Brown, Toti Cadavid, Janice Campbell, Joe

Conrad, Breckenridge Grover, Mark Johnson, Donlee Lane Tamela Lee, Jeff Metz,

Dean Pisciotta, Mark Renn, Jon Robinson, Steven Salter, Suzanne Shaw, Judith

Spires Bill Stevenson, and Deborah Wiest.  On information and belief, at all

relevant times each of said board of directors members resided in the State of

Colorado.

9.  In 2005, Barbara Grimm was the D/B BBB board of directors chair,

Bowen Banbury was the vice chair, Jerald Kaiser was treasurer, Tamela Lee was

its secretary, Hope Marie Dunlavey was immediate past chair, and Jean Herman

was president and chief executive officer.  Members at large of the D/B BBB

Board of Directors were Geta Asfaw, Darrel Brown, Steve Budnack, Toti Cadavid,

Janice Campbell, Joe Conrad, Breckenridge Grover, Mark Johnson, Donlee Lane,

Jeff Metz, Rob Naish, Ressie Pate, Dean Pisciotta, Mark Renn, Craig Reynolds,

Jon Robinson, Steven Salter, Allan Service, Suzanne Shaw and Bill Stevenson.

On information and belief, at all relevant times each of said board of directors

members resided in the State of Colorado.

10.  Chip Yost is an individual who is employed by a Denver, Colorado

television station, Gannett Co., Inc. d/b/a KUSA-TV ("Gannett"), as a news

reporter, and, at all relevant times, was a resident of the State of Colorado.  Gannett

is a Virginia corporation with its principal place of business in McClean, Virginia

and doing business at all relevant times herein in Denver, Colorado and was the

employer of Chip Yost.

6

11.  Harold G. Donahue ("Donahue"), C. Eric Morgenthaler ("Morgenthaler"), and Timothy McKenna are individuals who were former employees of GENERAL STEEL, who at all relevant times herein resided in the State of Colorado.

12.  Defendant Steelwise LLC ("Steelwise"), is a limited liability company, organized and existing under the laws of the State of Colorado, with its principal place of business in Denver, Colorado.  Donahue is one of its owners and Morgenthaler is a former employee of Steelwise.

13.  The Council of Better Business Bureaus, Inc. ("CBBB"), is a Delaware corporation, with its principal place of business located in Arlington, Virginia.  The CBBB is a business membership organization, who finances itself by selling national memberships to large corporate members, and who charters local Better Business Bureaus in return for a percentage of the fees generated by membership in said local better business bureaus.

14.  At all relevant times, Kenneth J. Hunter was president and chief executive officer of the CBBB, and was a resident of the State of Virginia.

15.  Patricia Madrid is the Attorney General for the State of New Mexico and was, at all relevant times herein, the employer of Anita Wolff ("Wolff").Wolff is a paralegal employed in the office of the Attorney General of New Mexico.

16.  Upon information and belief, Dana Beers, Sue Beers and Kirk Jarvis are

Nebraska residents.  Dana and Sue Beers (collectively "Beers") were customers of General Steel.

17.  Each and every defendant who is a nongovernmental entity defendant, and/or who is a natural person, is sued in both his/her individual/personal capacity, as well as in his/her official capacity.

## FACTS COMMON TO ALL COUNTS

18.  Each and every allegation set forth in each and every averment of this pleading hereby is incorporated by this reference in each and every other averment and allegation of this pleading, as though fully set forth therein.

19.  The plaintiff was deprived of interests protected by the Constitution and/or laws of the United States of America, and each and every defendant caused, by commission, omission, and/or by conspiracy, the deprivation of interests, while acting under color of states' laws and also caused the RICO violations.

20.  All acts and/or omissions perpetrated by each defendant, was engaged in maliciously, callously, oppressively, wantonly, recklessly, with deliberate indifference to the rights allegedly violated, despicably, and with evil motive and/or intent, in disregard of the rights of the  plaintiff, and under color of state law.

**I.      FACTS PERTAINING TO THE VIOLATION OF PLAINTIFF'S
          CONSTITUTIONAL RIGHTS AND RICO VIOLATIONS BY
          THE D/B BBB DEFENDANTS, THE COLORADO AG**

**DEFENDANTS, AND THE SACRAMENTO DA DEFENDANTS**

21.  Plaintiff GENERAL STEEL is in the business of selling private-label, pre-engineered steel buildings that are manufactured by contract suppliers pursuant to its rigid specifications, throughout the United States, including the State of California, either directly or through its dealers.  Types of buildings marketed and sold by GENERAL STEEL include church buildings, agricultural buildings, airline hangars, and small buildings suitable for storage or use as garages.  GENERAL STEEL advertises its private label brand of products on radio shows, and via direct marketing, including postcards, and employs over 150 people in the Lakewood, Colorado area.

**(i)  The D/B BBB.**

22.  The D/B BBB is a business membership tax-exempt organization, and a 501(c)(6) Colorado corporation, operating within the Denver-Boulder area, Colorado.

23.  The D/B BBB is akin to a franchise and is chartered by the CBBB, a national business membership nonprofit corporation, who receives a percentage of the D/B BBB's membership revenues.

24.  As such, the D/B BBB is bound by the operating standards, policies, practices and procedures promulgated by the CBBB.

25.  Its failure to adhere to CBBB operating standards can result in the revocation of its charter by the CBBB.

26.  The primary stated objective of the D/B BBB is to secure business memberships.  Membership fees and mediations fees between businesses and consumers constitute the bulk of its income.

27.  In order to promote itself as a consumer protection agency, and to coerce/entice businesses into joining the D/B BBB, the D/B BBB publishes a rating scheme for companies within its geographic area, known as "reliability reports."

28.  Reliability reports reflect consumer complaints against both member and non-member companies.

29.  Beginning in 2002, Better Business Bureau reliability reports became available on-line, so that the general public could view the reliability reports of companies and file complaints on-line.

30.  Inquiries from consumers throughout the United States regarding companies located in the Denver/Boulder area are directed by the CBBB to the D/B BBB's website for reliability reports.

31.  Reliability reports generated by the D/B BBB rate a company either as satisfactory or unsatisfactory, and list complaints received by the D/B BBB against a member/non-member company, according to a coded matrix.

32.  The reliability reports indicate whether or not a complaint was resolved or not resolved, and whether an attempt was made by the company to resolve the complaint.

33.  The general public perceives the D/B BBB to be a governmental agency.  As set forth herein below, at all relevant times the D/B BBB acted and continues to act under color of law as a quasi-governmental agency.

34.  The reliability reports generated by the D/B BBB operate to promote or damage companies' reputations, depending upon whether or not they are rated satisfactory or unsatisfactory by the D/B BBB.

35.  A benefit of membership promoted by the D/B BBB is the promise that customer complaints will be promptly communicated to the business member, and a specialist trained in resolving customer complaints will work with the business to attempt to resolve any complaints against it.

36.  Such specialists are designated by the D/B BBB as dispute resolution specialists.

37.  The D/B BBB board of director defendants for the years 2003, 2004, 2005, are comprised of persons who are officers or employees of companies belonging to the D/B BBB.

38.  On information and belief, Herman gives preferential treatment to companies whose officers or employees are, or who become, members of the D/B

BBB board of directors.

39.  This includes awarding an advertising campaign contract to Cactus Marketing Communications, without first obtaining the 2003 Board of Directors' approval, and without securing any bids from other advertising agencies.

40.  An officer/employee of Cactus Marketing Communications subsequently became a member of the 2004 and 2005 D/B BBB Board of Directors.

41.  On information and belief, at all relevant times herein, the D/B BBB boards of directors defendants for the years 2003, 2004, and 2005, all of whom were officers and/or employees of D/B BBB member companies knew of, and condoned and acquiesced in the wrongful conduct of defendants Herman, Fehling, Rossman, and Toscano, as hereinafter alleged.

42.  In late 2002, the D/B BBB was given a triennial audit review by the CBBB, to insure that the D/B BBB was in compliance with the operating standards promulgated by the CBBB.

43.  The D/B BBB did not pass the CBBB standards relating to reporting standards and advertising reviews, and was found by the CBBB auditor "to be substantially out of compliance with BBB Reporting Standards," and was given six months' time to comply.

44.  The D/B BBB did not come into compliance with the CBBB operating

standards until August 4, 2003.

45.  The D/B BBB never reported the fact that it was not in compliance with CBBB operating standards and had failed its triennial audit review as to its website, and was not required to do so by the CBBB.

**(ii)    The D/B BBB And  Defendants Herman, Fehling, Rossman And Toscano (The "D/B BBBB Defendants), And The CBBB And Hunter Acted Under Color Of Law With Respect To The Section 1983 Claims Alleged Herein .**

46.  On or about January 26, 2001, the D/B BBB entered into a five year contract ("D/B BBB-AG Contract") with the Colorado Attorney General's Office ("Colorado AG"), whereby consumer complaints made to the Colorado AG were to be initially processed by the D/B BBB.

47.  The contract provided that the D/B BBB would be the Colorado AG's partner in consumer protection and would provide the Colorado AG's office with monthly reports of patterns of complaints, and "other pertinent information of interest to the Attorney General" And that the D/B BBB and the Colorado AG's office would be partners in consumer protection.

48.  The Colorado AG's office utilized the D/B BBB for investigation and law enforcement activities.

49.  In consideration for the services provided to it by the D/B BBB, the Colorado AG's office paid the D/B BBB $10,000.00 for the specific purpose of

13

implementing the agreement.

50.  Kenneth J. Hunter and the CBBB approved of and considered the CBBB to be a participant in the partnership between the D/B BBB and the Colorado AG.

51.  One of the conditions of the D/B BBB-AG Contract was that reliability reports issued by the D/B BBB would be handled in accordance with the D/B BBB general policies and practices, which are governed by CBBB operating standards.

52.  Another condition of the D/B BBB-AG Contract was that the D/B BBB and the Colorado AG's office "work cooperatively to coordinate efforts in working with the media and to exchange with each other all news releases, consumer advisories, and business alerts on a timely basis."

53.  As a result of the D/B BBB-AG Contract, a program known as the "Colorado Consumer Line" was implemented on January 2, 2001, whereby complaints against businesses located in its geographic area would be processed by the D/B BBB.

54.  D/B BBB personnel would determine which complaints would be brought to the attention of the Colorado AG's office for investigation and prosecution.

55.  As a part of the D/B BBB-AG Contract, complaint information on businesses contained in the D/B BBB files was made available to the Colorado AG's office without a subpoena and without notice either to the consumer or the

14

business against whom the complaint was made.

56.  In or around 2003, the D/B BBB created a software program in order for the Colorado AG's office to have instant access to its files.

57.  On or about January 2002, defendant Herman became the chief executive officer and president of the D/B BBB.

58.  On or about August 15, 2002, defendant Herman became dissatisfied with the D/B BBB contractual relationship with the AG, and Herman made a demand to defendant Salazar, describing the contract as a partnership between the D/B BBB and the Colorado AG,  that the D/B BBB receive additional compensation and greater recognition in the media from the Colorado AG's office.

59.  At or around the same period of time, the Colorado AG's office entered into a settlement with Qwest, a Colorado communications organization, for $1 million dollars.

60.  On or about August 23, 2002, defendant Herman made a formal demand defendant Salazar to receive a payment of $100,000.00.

61.  Defendant Herman claimed that, because of "the thousands of complaints that the BBB processed that made this agreement possible, and the significant administrative/clerical support that this work required, we believe we are fairly and appropriate [*sic*] due this compensation."

62.  According to defendant Herman's August 23, 2002 letter to defendant

Salazar, the $100,000 payment demanded by Herman represented ten percent

(10%) of the $1 million settlement by Qwest with the Colorado AG's office.

63.  The August 23, 2002 letter from defendant Herman to defendant Salazar

demanding compensation, also demanded "more tangible evidence of the D/B

BBB-AG partnership's commitment in the form of recognition and conscious 'co-

branding,' i.e., both the Attorney General and the Better Business Bureau are

*owners of and contributors to* the Colorado Consumer Line, and critically needed

compensation to cover the costs we incur as a result of our efforts."

64.  In response to Herman's demand to Salazar for ten percent (10%) of the

Qwest settlement, on May 13, 2003, a new contract was entered into by defendant

Zavislan on behalf of the Colorado AG's office and the D/B BBB providing for

10% of the proceeds of the Qwest settlement to be funneled to the D/B BBB.

65.  As a result of the contract, $100,000 was paid out of Colorado State

funds to the D/B BBB.

66.  In 2001, the D/B BBB formed a nonprofit 501(c)(3) tax-free affiliate,

known as the Denver Boulder Better Business Bureau Education Foundation

("D/BBBBEF"), purportedly to provide information products and educational

programs.

67.  The true purpose of the BBBEF was to funnel advertising revenues

generated by paid advertising in the D/B BBB's Consumer Directory into the

BBBEF, which otherwise would have been taxable income to the D/B BBB, because the revenue derived from Consumer Directory advertising was unrelated to the exempt purpose of a membership organization such as the D/B BBB.

68.  The $100,000 paid from public funds to the D/B BBB was deposited into the account of the D/B BBB affiliate, the D/B BBBEF.

69.  On information and belief, the D/B BBB transferred the $100,000 into the D/B BBBEF account as a tax avoidance measure.

70.  Only $37,928 of the $100,000 was used by the D/B BBBEF to establish a Spanish speaking outreach program.

71.  An amount of $28,102 was used for seminars that promote the use of D/B BBB services, and thus increase its revenue, and the balance was used to buy D/B BBB office equipment and pay D/B BBB employee salaries, including, on information and belief, an $11,000 bonus to Herman.

72.  The Colorado AG's office has never sought, and the D/B BBB never has provided, an accounting of the public funds improperly distributed to the D/B BBB.

**(iii)  The D/B BBB Engages In Deceptive Sales Practices In Recruiting New Members Of The D/BBB**

73.  At all relevant times herein, Herman and the D/B BBB boards of directors defendants for the years 2003, 2004, and 2005, and Hunter and the

CBBB, knew of, and condoned, acquiesced in and/or permitted the sales department of the D/B BBB to employ deceptive sales practices which, included, but were not limited to, the deceptive sales practices hereinafter set forth, in order to recruit new members and thus increase its revenue.

74.  As set forth herein below, on information and belief, the business of at least one company associated with  D/B BBB board of directors member also benefited financially from the D/B BBB's deceptive sales practices.

75.  The sales department of the D/B BBB utilizes a written sales script generated by the vice president of sales and membership development, Robert Jellum, who was and is directly responsible to Herman.

76.  Each salesperson is trained strictly to follow the written sales script on every sales call initiated by the D/B BBB.

77.  The telephone calls of salespersons to targeted businesses are monitored by Jellum to insure compliance with the sales script.

78.  Each salesperson must meet a quota of 14 new memberships a month, and a minimum volume of $5,000.00 or risk termination for lack of performance.

79.  D/B BBB membership fees are based on the number of employees a member company employ.

80.  As set forth hereinbelow, after the Qwest settlement with the Colorado AG, Herman and Jellum actively sought the membership of Qwest, a very large

company with hundreds of employees, even though the large number of consumer complaints against it had resulted in governmental action by the Colorado AG's office and a concomitant $1 million dollar fine, and even though Qwest continued to receive thousands of consumer complaints against it.

81.  One of the purposes of the D/B BBB sales script is to generate a "one call close," whereby the business is signed up for membership on the first call initiated by the salesperson, and has no time to reflect on whether or not it would be in the best interest of the business to become a member of the D/B BBB.

82.  Jellum receives a percentage of the sales commission generated by each salesperson of approximately 5 ½ percent, and himself sells D/B BBB memberships to large businesses, and therefore derives considerable personal gain from boosting membership sales to businesses.

83.  Although D/B BBB employs sales persons who work solely on a commission basis and earn a commission ranging from 40 to 55 percent of the new membership fee for each new business they recruit as a D/B BBB member, the D/B BBB has a deceptive practice of holding out to businesses targeted by its sales people, and to the general public, that its sales persons are in the "Business Relations Department."

84.  By deceptively designating D/B BBB commissioned salespersons as "business relations" employees, the D/B BBB thereby creates the false impression

that the salespersons are on fixed salaries and derive no personal financial gain from each sale of a business membership they generate.

85.  As a result, businesses targeted by D/B BBB salespersons for membership in the D/B BBB do not suspect that the "business relations" employee soliciting membership in the D/B BBB is in fact using the high pressure sales tactics normally associated with commissioned sales persons, whose primary goal is to secure a commission, and the businesses are more gullible and susceptible to the sales pitch of the salesperson working from the sales script, which Jellum and Herman required each salesperson to use.

86.  On information and belief, D/B BBB salespersons utilized the partnership with the Colorado AG's office as a selling tool, and as a part of their sales pitch to sell new D/B BBB memberships, and to solicit sponsorships, because the formal partnership with "a branch of state government" made the D/B BBB look more credible and implied that businesses would get favorable government treatment.

87.  Herman and Jellum knew of, and condoned and approved of the oppressive, coercive, overbearing and deceptive sales tactics used by a top-performing D/B BBB salesperson who consistently informed businesses targeted for membership in the D/B BBB that their failure to join the D/B BBB would guarantee a consumer service issue or complaint, and that, without the shield of the

D/B BBB, the company would be unable to resolve the issue or complaint.

88.  Because of the large amount of revenue generated by the oppressive, unethical sales tactics utilized by the salesperson, who was described by Jellum as a "great performer" and the D/B BBB's "number one" salesperson, that person was permitted by Jellum to continue to coerce businesses into joining the D/B BBB, and was not terminated by Herman or Jellum.

89.  As part of the written sales script, salespeople for the D/B BBB were required to falsely inform a business targeted for membership that it had "maintained a great record with the BBB," when in fact leads for the sales calls generally came from accessing Colorado Secretary of State filings for new business that had been in business for as little as a year.

90.  The targeted businesses falsely were led to believe that membership was by invitation only to select businesses who uphold the highest standards of ethical business practices, and that approval of the D/B BBB board of directors was necessary for membership.

91.  In truth and in fact, the D/B BBB boards of directors Defendants rubber-stamped membership approvals, including the approval for the Qwest membership in the D/B BBB, which not only had and continues to have a very high complaint volume, but also had a prior adverse government action from which the D/B BBB had benefited to the tune of $100,000.

92.   Both Qwest and Echostar, another large company with a huge volume of complaints rated satisfactory, neutrally or unrated by the D/B BBB in their reliability reports fail to mention that they were both the subject of government action.

93.   Another false and deceptive practice utilized by sales persons of the D/B BBB pursuant to the D/B BBB written sales script, was to claim that potential customers of the targeted business had called the D/B BBB to check on its "business performance record before doing business with [the] company."

94.   According to the sales script, the targeted business was required to be told by the D/B BBB salesperson that the potential customers wanted the answer to four specific questions, including whether it was a company they could trust; whether it was an ethical business; whether it took care of its customers; and whether it was a member of the D/B BBB.

95.   In truth and in fact, the D/B BBB consumer inquiry database does not record the actual content of inquiries about a company, and the questions were designed to falsely induce business to join the D/B BBB and create a false sense of urgency that unless the targeted company immediately joins the D/B BBB, customers will perceive it as neither an ethical nor a trustworthy company, and that it would not take care of its customers because it is not a D/B BBB member.

96. Payment of D/B BBB membership dues were solicited at the time of the

22

first call, and, after payment was made, the application for membership and the

membership agreement was only then faxed to the new member.  None of the

consequences of becoming a member, such as membership revocation without due

process, and rating a company unsatisfactory, or suspending it at the whim of the

D/B BBB president and CEO Herman, were made known to the new member, and

frequently the new member was issued a membership plaque prior to the D/B BBB

conducting a due diligence inquiry with respect to the new member or seeking D/B

BBB board of directors' approval for admission of that member.

97.  The sales script also requires each salesperson to encourage the new

business to list its business in a special Denver News Agency insert that lists

businesses by industry and identifies them as D/B BBB members.

98.  The cost of the listing is an additional $100.  The Denver News Agency

list of businesses then is then inserted in The Denver Post, a Denver, Colorado,

newspaper.

99.  The Denver Newspaper Agency, which, on information and belief,

benefits financially from having the D/B BBB list member companies on the

Denver News Agency list of businesses, has an officer/employee sit on the D/B

BBB board of directors.

100.  In 2003/2004, Dwight Brown of the Denver News Agency was a D/B

BBB board member that was replaced on the 2005 D/B BBB board of directors by

Ressie Pate, also an officer/employee of the Denver News Agency.

101.  Despite the conflict of interest, Herman and the remaining board of directors condoned and acquiesced in the referral of new businesses to a company associated with a member of the D/B BBB board of directors.

102.  Under the operating standards promulgated by the CBBB, and mandated to be followed by local Better Business Bureaus, including the D/B BBB, reliability reports must be accurate and unbiased with respect to both members and nonmembers of the D/B BBB.

103.  The D/B BBB discriminates against nonmembers of the D/B BBB in the reliability reports it publishes on all businesses in its geographic area, regardless of whether the business has chosen to be a member of the D/B BBB, which further exerts pressure on businesses to join the D/B BBB.

104.  As part of the sales script directed at targeted businesses, salespersons quote a section contained only in the reliability reports of D/B BBB members. Under the heading "BBB Membership," the text reads:  "This company has been a member of this Better Business Bureau since [month and year joined].  This means it supports the Bureau's services to the public and meets our membership standards."  The clear implication of this statement is that only businesses who are ethical and trustworthy, consumer-friendly, and public minded are members of the D/B BBB, and that non-members are not.

105.  As interpreted by the D/B BBB sales script, which the salespersons are required to pitch to targeted businesses, the section contained only in the reliability reports of D/B BBB members indicates that a business that is a D/B BBB member is "(a member in good standing.  Ethical, a reliable business, a business they [the consumer] can trust, meets the BBB standards, they can TRUST YOU)  Which gives the customer the confidence to do business with  you?  What a competitive edge."

106.  Thus, expressly and impliedly, the D/B BBB denigrates and discriminates against nonmember companies, who are under no obligation to join the D/B BBB and whose record may be exemplary.  Because the statement appears only in the reliability reports of D/B BBB member businesses, and necessarily is omitted from nonmember reliability reports, when a consumer accesses the D/B BBB website and compares companies based on their reliability reports, a nonmember company will suffer in comparison to the D/B BBB member, because the consumer likely will conclude that the nonmember company is not a member of the D/B BBB because it does not meet its "membership standards."

107.  The D/B BBB also discriminates against nonmember companies by referring consumers who re a reliability report on nonmember companies to its list of D/B BBB members of the same trade group as the nonmember.

108.  The CBBB, the Colorado AG and the Sacramento DA defendants, and

each of them, knew of and condoned and acquiesced in the discriminatory

treatment of nonmember companies by the D/B BBB.

### (iii) Preferential Treatment Accorded By Herman to D/B BBB Sponsors.

109.  After the Qwest settlement with the Colorado AG's office, Herman

recruited Qwest as a D/B BBB platinum sponsor, carrying dues of $10,000, in

February 2004, and although the D/B BBB continued to receive thousands of

complaints against Qwest, Herman and Fehling gave Qwest a satisfactory rating in

D/B BBB reliability reports, and created a special database system which enabled

Qwest, and other large companies having numerous complaints, to respond to the

complaints online, in order more rapidly to resolve complaints.  Herman also

assigned a dispute resolution specialist specifically to deal with and shield

complaints against Qwest from consumers.

110.  Similarly, another company, Echostar, had thousands of complaints

made against it to the D/B BBB, and had an unsatisfactory rating with the D/B

BBB, prevailed upon by Herman to become a D/B BBB platinum sponsor, was

able to resolve its complaints online, and shared the dispute resolution specialist

especially assigned to deal with consumer complaints against Qwest.

111.  Thereafter, Echostar also began to receive a satisfactory rating in its

reliability reports and presently has a neutral rating or is unrated, also with no

26

mention that it had been the subject of government action.

112.  At all relevant times, a competitor of GENERAL STEEL, Wedgcor, was a sponsor of the D/B BBB, and consumer complaints against Wedgcor and its affiliates, which included Rockford Steel Buildings, another D/B BBB Sponsor, and Sunward Corp, Regency Steel Buildings and Gold Seal, were minimized and/or not recorded at all in their D/B BBB reliability reports.

113.  Reliability reports of Wedgcor and its affiliated companies did not link the companies or identify them as affiliated companies, although each of said companies, except Gold Seal, operated from the same address as Wedgcor, and were owned and/or controlled by Wedgcor's owner, Danton Wirth and/or members of his family.

114.  On information and belief, any company who becomes a sponsor of the D/B BBB and pays sponsorship fees ranging from $1,500 to $10,000, is shielded by Herman from consumer complaints and is always given a satisfactory rating.

115.  On information and belief, any company who had an officer and/or an employee appointed to the board of directors of the D/B BBB during the years 2003, 2004, and 2005, or who was a sponsor of the D/B BBB, was given preferential treatment by the D/B BBB, was shielded by Herman from consumer complaints, and always was given a satisfactory rating.

**(iv)  Herman Targets GENERAL STEEL.**

27

116.  In December 1996, GENERAL  STEEL was induced to become a member of the D/B BBB, based on the D/B BBB representations that it would contact GENERAL STEEL whenever the D/B BBB received any complaints about GENERAL STEEL, and D/B BBB dispute resolution specialists would work with GENERAL STEEL to attempt to resolve any such complaints.

117.  From 1996 until February 2003, GENERAL STEEL always was given a satisfactory rating by the D/B BBB, complaints against it had declined and were minimal in relationship to its growth, and most of the complaints against GENERAL STEEL related to the D/B BBB credit/billing or customer service categories for coding complaints.

118.  As of October 2002, no advertising complaints were registered against GENERAL STEEL, and of the 42 complaints registered during the 36 month period prior to October 24, 2002, only 9 complaints were coded as sales complaints by the D/B BBB dispute resolution specialist who handled GENERAL STEEL's complaints.

119.  The October 14, 2002, reliability report indicated that GENERAL STEEL always resolved the majority of its complaints and had made a good faith attempt to resolve the remaining consumer complaints against it.

120.  The October 24, 2003 reliability report for GENERAL STEEL indicated that "[t]he number and type of complaints are not unusual for a company

in this industry."

121.  In the fall of 2002, defendant Herman began to target GENERAL STEEL for investigation and prosecution by its partner the Colorado AG's office in order to harm GENERAL STEEL.

122.  Herman provided defendant Zavislan with a report relating to GENERAL STEEL and requested that the Colorado AG's office investigate GENERAL STEEL.

123.  Defendant Herman also targeted GENERAL STEEL to benefit one of GENERAL STEEL's competitors, Wedgcor, a D/B BBB sponsor, which, as set forth herein below, received preferential treatment of complaints against it, in that only a few of the numerous complaints made to the D/B BBB against Wedgcor and its affiliated companies, Sunward Corporation, Rockford Steel Buildings, also a sponsor of the D/B BBB, Regency Steel Buildings and Gold Seal were reported in their respective reliability reports, nor was the fact that the companies were affiliated reported in their respective reliability reports.

124.  In the fall of 2002, an employee of Sunward Corporation purchased on behalf of the Wedgcor Group, the domain name <generalsteel.com>, which was transferred to Wedgcor on October 18, 2002.

125.  GENERAL STEEL learned that Wedgcor had acquired the domain name, and on or about December 16, 2002, requested that the domain name be

transferred and/or sold to GENERAL STEEL.

126.  Wedgcor declined to sell the domain name to GENERAL STEEL and instead activated the website at the domain name  <general steel.com>.  Content on the website included the intentionally false statement that  <generalsteel.com > was the "Internet's Complete Source for Factory Direct Wholesale Metal Buildings."

127.  The website contained no active hypertext links, and did not identify Wedgcor.

128.  A viewer of the website would assume that the website belonged to GENERAL STEEL.

129.  On or about January 13, 2003, GENERAL STEEL filed a complaint with the National Arbitration Forum ("Forum") and, under the Domain Discover registration agreement, Wedgcor and the Sunward employee who nominally owned the domain name, were bound to resolve domain-name disputes brought by third parties, in accordance with ICANN'S Uniform Domain Name Dispute Resolution Policy.

130.  On or about March 4, 2003, at or about the same time that, as set forth herein below, Herman advised GENERAL STEEL that she was seeking revocation of its membership in the D/B BBB, the Forum issued findings holding that Wedgcor was an entity affiliated with Sunward Corporation and was an entity which was in direct competition with GENERAL STEEL and its products, and that

the domain name <generalsteel.com> was confusingly similar to GENERAL

STEEL's registered mark GENERAL STEEL CORPORATION.

131.  Noting the antagonistic relationship that existed between Wedgcor and

GENERL STEEL, the Forum further found that Wedgcor had no rights or

legitimate interests in the use of the domain name, and that the domain name had

been registered, and was being used, in bad faith to gain customers from

GENERAL STEEL and/or to disrupt GENERAL STEEL's business.

132.  Based on its findings, the Forum ordered the domain name

<generalsteel.com> transferred from Wedgcor to GENERAL STEEL.

133.  On information and belief, Herman was aware of the attempt by

Wedgcor and its affiliated companies to gain customers from GENERAL STEEL

and to disrupt its business, and as set forth more fully hereinbelow, at or about the

same time as Wedgcor attempted to steal and co-opt GENERAL STEEL's

customers and disrupt its business, Herman set about to revoke GENERAL

STEEL's membership  from the D/B BBB and to initiate the investigation and

prosecution of GENERAL STEEL by the Colorado AG's office, in order to benefit

Wedgcor and its affiliated companies.

134.  A company with a satisfactory rating could not have its membership

revoked by the D/B BBB.

135.  Rating a company unsatisfactory, however, would constitute "pertinent

[adverse] information of interest to the Attorney General," and was required to be provided to the Colorado AG's office under the D/B BBB-AG Contract.

136.  Under the D/B BBB-AG Contract, Herman could and did initiate the investigation and prosecution of GENERAL STEEL by the Colorado AG's office, and in turn, the Sacramento DA's office, merely and only by providing the Colorado AG's office with adverse information against GENERAL STEEL, which would include an unsatisfactory rating of GENERAL STEEL, revocation of its membership with the D/B BBB, and/or by falsely showing that a pattern of complaints existed against GENERAL STEEL.

137.  Thus, in order to further the prosecution of GENERAL STEEL, in December 2002, Herman set in motion a process whereby she caused GENERAL STEEL's satisfactory rating in its D/B BBB reliability report to be changed to unsatisfactory.

138.  Herman did this in order to cause the revocation of GENERAL STEEL's membership with the D/B BBB.

139.  Herman caused GENERAL STEEL's reliability reports falsely to report and give the false impression that a pattern of complaints existed against GENERAL STEEL that fell within the purview of the Colorado Consumer Protection Statutes and the California Consumer Protection Statutes, namely, complaints relating to advertising, sales, and delivery issues.

140.  To that end, Herman recruited two, new, inexperienced, unqualified employees, Rossman and Fehling, and specifically delegated to them all matters pertaining to GENERAL STEEL.

141.  As hereinafter set forth, said defendants, and each of them, falsely and fraudulently created a pattern of complaints which they published in GENERAL STEEL's reliability reports, and falsely and fraudulently instituted an advertising review campaign against GENERAL STEEL, in order to give GENERAL STEEL an unsatisfactory rating in its reliability reports, and to give the false impression that complaints against it primarily were advertising, sales, and delivery complaints, for the specific purpose of enabling the prosecution of  GENERAL STEEL by the Colorado AG's office and the Sacramento DA's office.

### (v)  Herman, Rossman and Fehling Acted Under Color of Law To Violate GENERAL STEEL's Constitutional Rights

142.  In or about June 2002, Herman hired defendant Rossman, then a 21 year-old D/B BBB college intern with no training or educational background, or experience or other qualifications in marketing or advertising, to review advertising for the D/B BBB.  Rossman's main qualification apparently was that she is the daughter of the CEO of the Northern Colorado BBB.

143.  Herman hired Rossman to perform advertising reviews in order to satisfy a CBBB requirement that the D/B BBB have an advertising review program

in effect.

144.  Prior to hiring Rossman, the D/B BBB had no advertising review program in effect.

145.  This was one of the reasons why the D/B BBB had failed its triennial audit by the CBBB.

146.  On or about October 17, 2002, the CBBB sent a letter to Herman indicating its dissatisfaction with the D/B BBB advertising program.

147.  The CBBB required the D/B BBB to increase its level of challenges to advertising claims, in order to be in compliance with Standard 17 of the CBBB, relating to advertising review requirements for local better business bureaus.

148.  In December 2002, Rossman graduated from college with a business administration degree and was given the title of advertising review specialist by Herman.

149.  In December 2002, Rossman was assigned by Herman to review GENERAL STEEL's advertising and to review its complaint file for advertising issues.

150.  Rossman was assigned to review only GENERAL STEEL's advertising and its complaint file, and was not instructed to review or compare the advertising of any other pre-engineered steel building companies located in the geographic area of the D/B BBB, including GENERAL STEEL's competitor,

34

Wedgcor and its affiliated companies, with that of GENERAL STEEL.

151.  Rossman had no qualifications, education, or experience necessary to conduct an advertising review of any company, much less to assess advertising specific to the steel building industry.

152.  Herman held out to the CBBB and to GENERAL STEEL that Rossman was qualified to conduct an advertising review of GENERAL STEEL.

153.  On December 17, 2002, Rossman requested copies of GENERAL STEEL's advertising, including tapes of its Denver radio advertising, and reviewed GENERAL STEEL's complaint file.

154.  The D/B BBB trained dispute resolution specialists who had coded GENERAL STEEL complaints for the 36 months prior to October 14, 2002, had coded no consumer complaints as advertising complaints; however, Rossman then unilaterally decided that the underlying cause of *all* of GENERAL STEEL's complaints was its advertising.

155.  On or about February 12, 2003, Herman suspended GENERAL STEEL's membership in the D/B BBB without any prior notice or opportunity to be heard, as required by the CBBB over the objections of Stephanie Kazmierski, the trained resolution specialist that had previously reviewed General Steel consumer complaints.

156.  The suspension was based on Rossman's review of GENERAL STEEL

advertising and her unfounded conclusion that all of the D/B BBB customer

complaints against GENERAL STEEL stemmed from GENERAL STEEL's radio

advertising.

157.  Herman advised GENERAL STEEL that the D/B BBB would be

seeking the revocation of GENERAL STEEL's membership in the D/B BBB from

the D/B BBB board of directors.

158.  Prior to suspending GENERAL STEEL, Herman specifically directed

Stephanie Kazmierski, GENERAL STEEL's usual dispute resolution specialist, not

to tell GENERAL STEEL that it was going to be suspended.

159.  On February 13, 2003, the D/B BBB reported the suspension of

GENERAL STEEL in its reliability report, and claimed the suspension was due to

a "pattern of complaints involving selling practices, delivery issues, customer

services, and credit/billing issues."  Remarkably, only three of the six new

complaints recorded by the D/B BBB, suddenly were coded by the D/B BBB as

advertising complaints, although each of them also was coded as having been

resolved.

160.  On information and belief, the three advertising complaints were

suddenly coded by the D/B BBB as advertising complaints in D/B BBB's efforts to

support their unfounded conclusion that there existed a problem with GENERAL

STEEL's advertising.

161.  On or about February 10, 2003, Defendant Herman hired Fehling as vice president of operations of the D/B BBB in charge of D/B BBB operations staff, including the dispute resolution specialists, and gave him responsibility for reliability reports and advertising reviews.

162.  Herman also gave Fehling shared responsibility for media relations with another D/B BBB employee, Susan Liehe.

163.  Defendant Fehling had no marketing or advertising experience or dispute resolution experience, nor did Fehling have any experience in writing D/B BBB reliability reports.  For the four years prior to his employment at the D/B BBB, Fehling was employed by the CBBB, vending and installing software programs utilized by local better business bureaus, Fehling established his relationship with Herman as a result of selling and installing software programs at the D/B BBB.

164.  Thereafter, Fehling reported only to Herman.

165.  Herman assigned Fehling and Rossman exclusively to handle all of the matters relating to GENERAL STEEL, including coding complaints, writing GENERAL STEEL reliability reports, and reviewing its advertising and interacting with the Colorado AG's office under the D/B BBB-AG contract.

166  Fehling and Rossman attended Economic Crimes Roundtable meetings conducted at the Jefferson County District Attorney's office, that were  attended

primarily by members of the Colorado AG's office and other governmental agencies.

167.  Beginning in February 2003, Fehling would send the Colorado AG information relating to GENERAL STEEL, whenever it was requested by either Defendant Simonson or Nancy Bullis, an employee of the Colorado AG's office, including complaints contained in the D/B BBB files and correspondence exchanged with GENERAL STEEL.

168.  This included the February 12, 2003 suspension letter sent to GENERAL STEEL.

169.  This was done within the course and scope of the D/B BBB's relationship with the Colorado AG's office.

170.  Herman was always informed by Fehling about the requests for information from the Colorado AG's office.

171.  Herman never directed Fehling not to comply with the Colorado AG's office requests for information about GENERAL STEEL.

172.  Also, beginning in January or February 2003, the coding of GENERAL STEEL complaints was taken from the dispute resolution specialist who previously had been assigned to handle GENERAL STEEL matters.

173.  He/she had neutrally assigned codes to GENERAL STEEL complaints based on his/her assessment of the complaint received by the D/B BBB, or the

complainant's own assessment of the complaint, and thereafter only Fehling and/or Rossman coded GENERAL STEEL complaints.

174.  On or about March 3, 2003, in response to a request by GENERAL STEEL, Herman, Fehling, and Rossman, and the GENERAL STEEL's usual dispute resolution specialist, met with GENERAL STEEL representatives, including Jeffrey Knight, GENERAL STEEL's president and chief executive officer, purportedly to attempt to resolve the problems raised by Herman in her suspension letter to GENERAL STEEL.

175.  Prior to the March 3, 2003 D/B BBB meeting with GENERAL STEEL representatives, Fehling began to review GENERAL STEEL's D/B BBB file, as well as GENERAL STEEL's advertising materials and a sales script, but made no effort to determine the relative volume of GENERAL STEEL sales compared to other companies in the steel building industry.

176.  Fehling did not check industry advertising practices.

177.  At the March 3, 2003, meeting, GENERAL STEEL representatives provided data showing that its volume of business had doubled in the three year period beginning in 2000, and that relative to its increase in business, complaints against GENERAL STEEL actually had declined.

178.  In fact, Herman knew, as early as April 2002, that GENERAL STEEL's volume of business had increased.

179.  An additional reason for the increased number of complaints against GENERAL STEEL and, indeed, an across-the-board 75% increase in volume of complaints against all of the members of the D/B BBB, including Qwest and Echostar, was that, starting in 2002, consumers were able to file complaints on-line.

180.  Neither of these important, crucial factors were given any consideration by Herman, Fehling, and Rossman, because their corrupt and only purpose was to establish a pattern of complaints, and give GENERAL STEEL an unsatisfactory rating, which would justify the investigation and prosecution of GENERAL STEEL by the Colorado AG's office and the Sacramento DA's office.

181.  Instead, the March 3, 2003 meeting was held to give the false appearance of due process required by the CBBB's policies and procedures mandated to be followed by the D/B BBB, and also to obtain additional advertising materials from GENERAL STEEL and other confidential business information, to pass on to the Colorado AG and the Sacramento DA defendants, including the volume of GENERAL STEEL's sales.

182.  This was done on the pretext that it was required in order to lift the suspension Herman unilaterally had imposed on GENERAL STEEL's membership with the D/B BBB.

183.  During the March 3, 2003, meeting, Herman agreed to remove the

information relating to GENERAL STEEL's suspension from its reliability reports, which were published on the D/B BBB website, and promised GENERAL STEEL that the proposed revocation of GENERAL STEEL's membership in the D/B BBB would not be heard by the D/B BBB board of directors.  During the March 3, 2003 meeting, the D/B BBB did not inform GENERAL STEEL that it was working with and sharing information with the Colorado AG and/or the Sacramento DA.

184.  In fact, thereafter, Fehling did not modify the D/B BBB website to delete the information that GENERAL STEEL had been suspended from the D/B BBB.

185.  Instead, Fehling began to insert information into GENERAL STEEL reliability reports that directed consumers to a competitor's website -- steelbuildings.org -- and advised consumers about "hidden costs" associated with the sale of GENERAL STEEL buildings.

186.  Fehling did not refer consumers to the steelbuilding.org website in any of the reliability reports of GENERAL STEEL's competitors, and did not insure that the hidden costs information was included in the reliability reports of its competitors, including Tuff Shed.

187.  Because GENERAL STEEL provided data at the March 3, 2003, meeting demonstrating the growth of its business and the relative actual *decline* of complaints against it in relation to its volume of sales, and because complaints

against it increased only slightly in the four month period from October 2002

through March 2003, GENERAL STEEL substantiated its position that customer

complaints against it were reasonable, given its size and the nature of the industry,

and Herman, Fehling, and Rossman could not use that reason to give GENERAL

STEEL an unsatisfactory rating.

188.  Therefore, said defendants began to use Rossman's purported

advertising review as a basis to give GENERAL STEEL an unsatisfactory rating.

189.  In the D/B BBB March 11, 2003 reliability report relating to

GENERAL STEEL, the D/B BBB reverted to the statement published in the

GENERAL STEEL October 24, 2002 reliability report  that "[t]he number and type

of complaints are not unusual for a company in this industry," but also warned

potential customers of GENERAL STEEL that "[t]he Bureau is currently in

discussions with the company with regard to current advertising claims."

190.  Also in the March 11, 2003, D/B BBB reliability report relating to

GENERAL STEEL, the D/B BBB also warned prospective customers of

GENERAL STEEL that "[a]ccording to BBB files on this company, customers

have experienced a range of problems, primarily about how the company's product

is advertised and represented."

191.  In her letter to GENERAL STEEL dated March 10, 2003, Herman

falsely stated that its advertising had been reviewed by the National Advertising

Division ("NAD"), a subsidiary of the CBBB, which was untrue.

192.  The letter also stated that D/B BBB staff found GENERAL STEEL's advertising to be in violation of the BBB Code of Advertising.

193.  Herman knew that neither Rossman nor Fehling were qualified to make such a determination.

194.  As a result of the selective, oppressive, discriminatory tactics employed by Herman, Fehling, and Rossman, on March 17, 2003, GENERAL STEEL resigned from the D/B BBB.

195.  On March 25, 2003, Herman, Fehling, and Rossman began to rate GENERAL STEEL unsatisfactory in its D/B BBB reliability reports.

196.  They based that unsatisfactory rating on their false and fraudulent claim that GENERAL STEEL had failed to "substantiate or modify advertising claims."

197.  They abandoned their position that a pattern of complaints existed against GENERAL STEEL.

198.  Only after GENERAL STEEL's attorneys insisted that the competitor's name, STEELBUILDINGS.ORG., be removed from GENERAL STEEL's reliability reports, did Fehling do so in late March 2003.

199.  By inserting negative information only in the reliability reports of GENERAL STEEL, by rating it unsatisfactory on the groundless and baseless

claim that GENERAL STEEL's advertising practices were not in compliance with

NAD advertising standards, the D/B BBB Defendants encouraged complaints from

consumers who otherwise might not have complained, and harmed GENERAL

STEEL's business.

200.  At the March 25, 2003, monthly meeting of the Colorado Consumer

Line participants, including the Colorado AG's office and the D/B BBB, Fehling

specifically identified GENERAL STEEL as the "number one" company out of 14

companies whose membership had been revoked by the D/B BBB.

201.  In the report of the March 25, 2003 monthly meeting of the Colorado

Consumer Line, GENERAL STEEL was incorrectly identified as "Steel

Buildings."  In fact, in March 2003, Fehling referred customers of GENERAL

STEEL to the website of Steel Buildings, *i.e.*, steelbuildings.org.

202.  The March 25, 2003 report clearly was referring to GENERAL

STEEL, who was described as the "Number One company of 14 companies who

had been revoked by the D/B BBB," with the notation that GENERAL STEEL had

chosen to resign instead of being revoked.

203.  In or about January/February 2003, Herman revoked the memberships

of two affiliated steel building companies, Panel Steel Buildings, Inc. ("Panel

Steel") and Fast Trac Building Services, Inc. ("Fast Trac"), which operate from the

same address.

44

204.  The combined total number of complaints registered with the D/B BBB against Panel Steel and Fast Trac during the year 2003 exceeded complaints against GENERAL STEEL, even though the combined volume of sales of both companies is approximately one third that of GENERAL STEEL.

205.  Although Herman revoked the members of Panel Steel and Fast Trac, neither company was ever referred by Herman to the Colorado AG's office for investigation and prosecution.

206.  Indeed, as of February 7, 2006, Panel Steel and Fast Trac and their affiliated company, Armor Steel Buildings Inc., still had a combined total of 88 complaints, including a combined total of 40 sales complaints.

207.  Yet Fast Trac's reliability report indicated that "the company met with BBB in the Spring of 2003 and is currently working to correct those business practices that have resulted in consumer complaints."

208.  Thus, by singling out GENERAL STEEL for disparate, negative treatment and manufacturing a false basis for suspending GENERAL STEEL's membership and rating it unsatisfactory, Herman, Fehling, and Rossman succeeded in their corrupt purpose of placing GENERAL STEEL on a list of companies to be investigated and prosecuted by the Colorado AG's  office and the Sacramento DA's office.

**(vi)  The Sacramento DA's Office, Including Puerta and McHenry,**

**and Does 1 through 10,  Collaborated With The D/B BBB
And The Colorado AG's Office, including Simonson,
Berkenkotter and Langley, To Falsely Prosecute GENERAL
STEEL, And To Cause The Destruction Of Its Business.**

209.  At or around December 24, 2002, defendant McHenry, an investigator employed in the Sacramento DA's office, entered into a contract with GENERAL STEEL for a pre-engineered building.  Defendant McHenry learned about GENERAL STEEL and its products through its radio advertisements.

210.  In the course of negotiating the purchase of the building that McHenry desired to purchase from GENERAL STEEL, on February 18, 2003, McHenry sent a letter to GENERAL STEEL setting forth in detail that he had heard about GENERAL STEEL discounted buildings from radio advertising, the specifications of the building he intended to purchase, the various modifications that he made to the contract along with attendant costs, including delivery costs.

211.  McHenry claimed in the February letter that he had been misled and deceived with respect to the price of the building, as well as building components and delivery costs, and sought revocation of the contract he had entered into with GENERAL STEEL.

212.  McHenry indicated on the letter that copies had been sent to the California Attorney General's office, the Sacramento DA's office, the Colorado AG's office, and the Jefferson County District Attorney's Office in Golden,

Colorado, but nowhere in his letter did McHenry indicate he was employed as an investigator by the Sacramento DA's office.

213.  On information and belief, the Sacramento DA's office already was investigating GENERAL STEEL.

214.  The letter sent to GENERAL STEEL by McHenry was designed to fabricate a pattern of complaints against GENERAL STEEL for deceptive advertising and sales and delivery issues.

215.  Notwithstanding McHenry's failure to identify himself as a Sacramento DA investigator, he identified himself to a General Steel sales manager, and as a result of his threats to use his official position against General Steel, McHenry extorted a substantial discount on the building he purchased from GENERAL STEEL, and obtained free delivery and handling of a large addition to the building he had originally purchased.

216.  Contrary to his agreement with General Steel, McHenry informed General Steel that he was not going to retract or indicate resolution of his alleged problems with General Steel to government agencies.

217.  On March 19, 2003, notwithstanding the above, McHenry sent a letter to the Sacramento DA's office stating that his dispute with GENERAL STEEL had been resolved to his satisfaction, and sent copies of his letter to the California Attorney General's office, the Jefferson County District Attorney's Office, the

Colorado AG's office, the D/B BBB, and GENERAL STEEL.  No mention was made in this letter that McHenry was employed by the Sacramento DA's office.

218.  On information and belief, the detailed advertising, sales, and delivery complaints against GENERAL STEEL made by McHenry in the February 18, 2003 letter, became a blueprint for the investigation and prosecution of GENERAL STEEL by the Sacramento DA's and the Colorado AG defendants, and was provided by said defendants to the D/B BBB defendants.

219.  It was to be used to manufacture a pattern of complaints relating to the advertising, sale and delivery of GENERAL STEEL buildings.

**(vii)   The D/B BBB Re-Codes Consumer Complaints Against GENERAL STEEL To Establish A Pattern Of Advertising, Sales And Delivery Complaints.**

220.  Beginning on or about April 17, 2003, defendant Simonson began to review complaints against GENERAL STEEL and its advertising, and began to confer with Sacramento deputy DA, defendant Justin Puerta ("Puerta"), and Fehling and Rossman.

221.  On information and belief, based on their discussions with Simonson, Fehling and Rossman falsified the coding of complaints against GENERAL STEEL, in order to establish a pattern of advertising, sales, and delivery complaints that would justify the prosecution of GENERAL STEEL by the Colorado AG's office and the Sacramento DA's office.

48

222.  On October 24, 2002, the D/B BBB reliability report for GENERAL STEEL indicated that consumer complaints against GENERAL STEEL for the prior 36 months, which were coded by the D/B BBB dispute resolution specialists assigned to code GENERAL STEEL, consisted of zero advertising complaints, seven sales complaints, 11 delivery complaints, one repair/service complaint, three contract complaints, 12 customer service complaints, and eight credit/billing complaints.  A majority of the complaints were resolved by GENERAL STEEL, which had made good faith attempts to resolve all of the complaints.  The total number of complaints for the prior 12-month period was 23 complaints, and for the previous 36 months, the D/B BBB recorded a total of 42 complaints.

223.  Complaint types are initially assigned by the consumer making the complaint and are ultimately determined by the D/B BBB dispute resolution specialist who is handling the specific complaint.

224.  Closing codes indicating whether or not a complaint was resolved, unresolved, or a good faith effort to resolve it was made, also are entered by the dispute resolution specialist, who reviews the complaint, contacts the company, and attempts to resolve the complaint.

225.  Thus, the dispute resolution specialist assigned to handle complaints against GENERAL STEEL had the most complete information as to the type of complaint and its resolution.

49

226.  By March 4, 2003, the D/B BBB reliability report for GENERAL STEEL for the 36 month period prior to March 4, 2003, had changed so that, suddenly, three advertising complaints appeared in its reliability report for the previous four and a half month period, compared to none for the previous 36 month period; sales complaints increased from seven to nine, delivery complaints decreased from 11 to 9,  there continued to be one repair/service complaint, contract complaints increased from three to four complaints, customer service complaints stayed constant at 12, and credit/billing complaints increased from eight to 12.  The total number of complaints for the prior 12 months increased by seven from 23 to 30 complaints, and for the previous 36 months, the D/B BBB recorded a total of 55 complaints.

227.  By June 25, 2003, the D/B BBB reliability report for GENERAL STEEL indicated that consumer complaints against GENERAL STEEL for the 36 month period prior to June 6, 2003, advertising complaints increased from three to four, sales complaints increased from nine to 11, delivery complaints stayed constant at 9, one product quality complaint was added, there continued to be one repair/service complaint, contract complaints increased from four to five, customer service complaints decreased to 11, and credit/billing complaints increased from 12 to 15.  The total number of complaints for the prior 12 month period was 30, and for the previous 36 months, the D/B BBB recorded a total of 57 complaints.

228.  From October 2002 through mid-July 2003, GENERAL STEEL received only 15 new complaints, four of which were coded as advertising complaints, where previously there had been no advertising complaints.  The 11 non-advertising complaints were distributed among the same categories of complaints coded by the D/B BBB, more or less in the same proportion as the complaints coded in the October 24, 2002 GENERAL STEEL reliability report.

229.  Because advertising, sales and delivery complaints did not predominate, and comprised fewer complaints than complaints related to customer service and credit/billing issues, the complaints coded by the D/B BBB did not establish a pattern of complaints relating to advertising, sales or delivery practices needed by the Sacramento DA and/or the Colorado AG defendants in order to justify the prosecution of GENERAL STEEL.

230.  These complaints were not a basis for the D/B BBB rating GENERAL STEEL as unsatisfactory.

231.  Thus, on or about July 16, 2003, Fehling and Rossman re-coded complaints made against GENERAL STEEL during the immediately preceding 36-month period.

232.  Fehling and Rossman re-coded existing complaints against GENERAL STEEL to establish a pattern of advertising, sales, and delivery complaints.

233.  Thus, the July 17, 2003 D/B BBB reliability report for GENERAL

STEEL for the 36 month period prior to July 17, 2003, indicated a sudden and dramatic change in the types of complaints filed against GENERAL STEEL. Advertising complaints jumped from four to eleven, sales complaints from 11 to 17, and delivery complaints from nine to 17.

234.  Fehling and Rossman also started coding four GENERAL STEEL complaints in the D/B BBB category "refund or exchange issues," although for the three and a half years prior to July 17, 2003, GENERAL STEEL had no complaints coded in that category.

235.  As a result of the re-coding of GENERAL STEEL complaints by Fehling and Rossman, customer service/billing complaints fraudulently were decreased from 11 complaints to two complaints, and credit/billing complaints fraudulently were decreased from 15 complaints to one complaint.

236.  Thereafter, Fehling and Rossman, and Toscano, who succeeded Fehling and assumed his job responsibilities at the D/B BBB after Fehling left the D/B BBB in 2004, coded, or caused the coding of any new complaints against GENERAL STEEL as advertising, sales, or delivery complaints, so that by November 24, 2005, of the 65 complaints noted against GENERAL STEEL in its reliability report, there were 11 advertising complaints, 24 sales complaints, 18 delivery complaints, and no increase at all in customer service or credit/billing complaints.

237.  Fehling's and Rossman's fraudulent practice of falsely re-coding complaints, and Fehling's, Rossman's, and Toscano's fraudulent practice of falsely coding new complaints against GENERAL STEEL, so that it would appear that the bulk of complaints against GENERAL STEEL related to advertising, sales, or delivery issues, was done by Fehling, Rossman, and Toscano with the knowledge and consent of Herman.

238.  Defendants Salazar, Simonson, and Berkenkotter, and Scully, Puerta and thereafter Young, were aware of and condoned, acquiesced in, and approved of the false and fraudulent re-coding of old complaints by Fehling and Rossman, and were aware of and condoned, acquiesced in, and approved of Fehling's and Rossman's, and thereafter Toscano's, fraudulent practice of coding the bulk of new complaints against GENERAL STEEL in categories necessary to justify the prosecution of GENERAL STEEL.

239.  On information and belief, the D/B BBB defendants, and each of them, falsely re-coded complaints against GENERAL STEEL, and falsely coded new complaints in order artificially to boost complaints relating to the advertising, sales and delivery issues complained of in defendant McHenry's February 14, 2003 letter to the Sacramento DA's office, in order to further the prosecution of GENERAL STEEL by the Colorado AG and the Sacramento DA defendants for deceptive advertising, and sales and delivery issues.

240.  Beginning on September 11, 2003, approximately two months after Fehling and Rossman had re-coded GENERAL STEEL's complaints, and coding all new complaints as advertising, sales, or delivery issues, Fehling changed the basis for GENERAL STEEL's unsatisfactory rating, stating in GENERAL STEEL's reliability report that "[b]ased on BBB files, this company has an unsatisfactory record with the Bureau due to a pattern of complaints.  Although the company resolves the complaints, it has failed to correct the underlying reason for the complaints.  Complaints are concerning advertising, delivery and sales issues."

241.  After Fehling left the D/B BBB, Toscano and Rossman, who ceased her employment at the D/B BBB in August 2004, continued artificially to inflate advertising, sales, and delivery complaints by coding all new complaints in those categories, so that by November 15, 2004, of 90 complaints purportedly recorded during the preceding 36 months by the D/B BBB, 17 complaints were categorized as advertising complaints, 35 complaints were coded as sales complaints, and 14 complaints were coded as delivery issues.

242.  Because, as set forth herein below, the Sacramento DA's office began to focus on contract issues against GENERAL STEEL, beginning in 2004, defendants Herman, Fehling, Rossman, and Toscano also began falsely to code complaints under its "contract" complaint category.  Thus, although only a total of five contract complaints were recorded in the D/B BBB reliability report for

54

November 24, 2003, 15 complaints were coded as contract complaints by the defendants by November 15, 2004, although the total number of complaints against GENERAL STEEL had increased by only six during the preceding 12 month period, from 31 to 37 complaints.

**(vii)   Herman, Fehling, Rossman, Yost and Gannett Used An NAD Advertising  Review Procedure To Generate Negative  Publicity Against GENERAL STEEL In Order To Generate Complaints And Dissuade Consumers From Doing Business With GENERAL STEEL.**

243.  On April 10, 2003, Rossman sent GENERAL STEEL print advertising and tapes of radio advertisements to the NAD and  that the NAD review GENERAL STEEL's advertising.  On information and belief, one of the advertisements she represented to the NAD as a GENERAL STEEL advertisement, was the phony Wedgcor website <generalsteel.com>, which Wedgcor activated during December 2002, at or about the time Rossman was reviewing GENERAL STEEL's advertising, which had made the advertising claim that its buildings were wholesale and factory direct, and which, because of the domain name, appeared to be a GENERAL STEEL website.

244.  The NAD is funded by CBBB membership dues and 75-80 percent of its cases are corporate competitive challenges, and 20 to 25 percent are NAD monitored cases brought by the NAD to monitor the advertising marketplace. Only a very small percentage, or less than three percent, of advertising challenges

are brought by local Better Business Bureaus.  Participation in a NAD advertising

review case is voluntary.

245.  On April 27, 2003, the NAD responded to Rossman's April 10, 2003

letter, insisting that the NAD inquiry be kept confidential, and noting that "self-

regulation is a voluntary effort, and the structure can only work with both parties'

cooperation."  On behalf of the D/B BBB, and in order to challenge GENERAL

STEEL's advertising before the NAD,  Rossman was required by the NAD to sign,

on behalf of the D/B BBB,  a NAD/CARU/NARB participation agreement, a

clause of which provided that the D/B BBB would keep the proceedings

confidential throughout the review process.

246.  The NAD/CARU/NARB participation agreement also provided that

after the NAD decision relating to GENERAL STEEL was published, it could not

be mischaracterized, used, or disseminated for any advertising or promotional

purpose.

247.  On April 27, 2003, the NAD requested that GENERAL STEEL

participate in the NAD advertising review procedure.

248.  Notwithstanding that GENERAL STEEL was no longer a member of

the D/B BBB and had no obligation to comply with the code of advertising

promulgated by the CBBB, because the proceedings were to be kept confidential,

and because GENERAL STEEL believed that its advertising was in compliance

with industry standards, in or about May 2003, GENERAL STEEL in good faith

agreed to participate in the self-regulatory advertising review, and submitted

extensive substantiation materials for the claims subject to review by the NAD.

249.  On or about June 10, 2003, Fehling prepared a response to GENERAL

STEEL's substantiation of its advertising materials he submitted to the NAD were

taken from the D/B BBB complaint files for GENERAL STEEL.

250.  At least one of the advertising complaints coded and submitted by

Fehling and Rossman was not made by a GENERAL STEEL customer, an

advertising complaint made by two members of the same family was submitted as

two advertising complaints, and yet another complainant about GENERAL

STEEL's advertising was not the purchaser of the building, and the purchaser

wrote GENERAL STEEL a letter apologizing for the complaint.

251.  Another of the complaints listed by Fehling as an advertising

complaint involved a complainant who had engaged in arbitration with GENERAL

STEEL and had lost.

252.  Another complaint coded by Fehling and Rossman as an advertising

complaint was a complaint about delays, which were actually caused by the

customer himself.

253.  Thus, in addition to falsely re-coding old complaints and coding new

complaints against GENERAL STEEL as advertising, sales and delivery

complaints, Fehling falsely submitted complaints unrelated to advertising as advertising complaints to the NAD.

254.  In the June 25, 2003 reliability report for GENERAL STEEL, notwithstanding that GENERAL STEEL voluntarily was participating in the NAD proceeding, and had made a good faith effort to substantiate its advertising claims with the NAD, Fehling and Rossman continued to indicate in the reliability report that "this company has failed to modify or substantiate advertising claims."

255.  The defendants also added a section to the GENERAL STEEL reliability report entitled "Company Advertising," in which they falsely stated, "The Bureau has requested the company to substantiate specific advertising claims concerning superiority claims, omission of extra charges, and cost savings claims. The company has failed to provide an adequate response or modify claims."

256.  Fehling and Rossman omitted from GENERAL STEEL's reliability report the fact that GENERAL STEEL had submitted voluntarily to the NAD review of its advertising and had submitted extensive substantiation materials.

257.  GENERAL STEEL filed a response to Fehling's submission to the NAD on or about July 23, 2003.

258.  At all relevant times, the D/B BBB had and has media partnerships, including a media partnership with Gannett, a Denver, Colorado, television station.

259.  The media contact at Gannett was a television local news reporter,

Chip Yost ("Yost"), who specializes in consumer interest issues on a television program known as the "I Team."

260.  Via its media partnerships, the D/B BBB tries to maintain high visibility, and by cooperating with its media partners it is afforded the free publicity associated with media exposure.

261.  In or around June 2003, Defendant Fehling, with the knowledge and agreement of Herman, and the Colorado AG's Defendants, who, pursuant to the D/B BBB-AG agreement, were made aware of all D/B BBB contacts with the media, contacted Yost in order to plant a story negative to GENERAL STEEL, relating to the confidential NAD review, in order to generate complaints against GENERAL STEEL.

262.  Fehling, with the consent and approval of Herman and the Colorado AG defendants, allowed Yost to review D/B BBB files containing complaints against GENERAL STEEL, in violation of the privacy rights of the consumers, and also in violation of CBBB regulations governing the D/B BBB.

263.  Fehling contacted complainants to persuade them to speak to Yost.

264.  Herman and Fehling allowed and/or facilitated Yost's direct contact with complainants.

265.  In or around August 6, 2003, Fehling agreed to and was interviewed by Yost as part of the story Yost was doing on GENERAL STEEL.

266.  During his interview with Yost, Fehling breached the confidentiality agreement signed by Rossman on behalf of the D/B BBB and its agents and employees, and discussed and labeled as misleading the advertising claims of GENERAL STEEL that were the subject of the confidential NAD proceedings.

267.  Fehling also lied during the broadcast and stated that the D/B BBB had challenged GENERAL STEEL's advertising and had asked GENERAL STEEL "to provide us locally here in Denver with substantiation of these [advertising] claims, and they chose rather than to go through that process to resign their membership."

268.  Fehling knew that GENERAL STEEL voluntarily was participating in the NAD review of its advertising and had submitted materials substantiating its advertising to the NAD.

269.  Yost could not speak to one of GENERAL STEEL's customers, Greg Rodriguez, because Rodriguez had signed a confidential settlement agreement with GENERAL STEEL, so Fehling provided Yost with the D/B BBB files containing Rodriguez' complaints on file with the D/B BBB, which Yost quoted in the Gannett broadcast and in an August 7, 2003 article published and still accessible on the Chanel 9 website.

270.  In his August 7, 2003, article, Yost used the D/B BBB torch sign to highlight and promote the D/B BBB.

271.  At the time of the August 6, 2003 interview, GENERAL STEEL was

not given an opportunity to refute the defamatory, misleading statements made by Fehling and Yost.

272.  In a further attempt to harm GENERAL STEEL's business, in or around August 2003, Yost contacted one of GENERAL STEEL's primary radio advertisers, Paul Harvey.

273.  Yost attempted to dissuade Harvey from doing business with GENERAL STEEL.

274.  On information and belief, Fehling also provided copies of the confidential information submitted by GENERAL STEEL to the NAD for advertising review purposes and to substantiate its claims to the Colorado AG's and the Sacramento DA Defendants.

275.  Defendants condoned, acquiesced in, and agreed to the dissemination of false information about GENERAL STEEL, and in the breach of the NAD confidentiality requirement, both in the television broadcast and in the D/B BBB reliability reports relating to GENERAL STEEL.

276.  The media interview was made by Fehling in order to ramp up negative publicity against GENERAL STEEL and prejudice the general public against the GENERAL STEEL, in order to harm GENERAL STEEL's business and to generate more consumer complaints against it so as to justify the lawsuits contemplated by the Colorado AG and the Sacramento DA defendants.

277.  GENERAL STEEL was unable to respond to or defend the spurious charges made by Fehling during the Yost interview, or disclose that it was in fact in the process of substantiating its advertising before the NAD, because it was bound by the confidentiality clause in the NAD/CARU/NARB participation agreement it had signed in order to participate in the NAD advertising review process.

278.  On or about October 2, 2003, the NAD issued its decision relating to the advertising review of GENERAL STEEL's advertising, and did not find any violations of the BBB Code of Advertising or that the GENERAL STEEL's advertising was deceptive or misleading, and recommended only that some of GENERAL STEEL's advertising be modified.

279.  The NAD decision also included a statement by GENERAL STEEL that it would modify its advertising to reflect the modifications suggested by the NAD.

280.  The NAD letter accompanying its decision which was sent to the D/B BBB and GENERAL STEEL reiterated its policy, set forth in the NAD/CARU/ NARB participation agreement, that "NAD findings may not be used for promotional purposes or to indicate impropriety by any party."

281.  Rossman also was advised by Andrea Levine of the NAD shortly thereafter that the NAD would be issuing a press release and that the D/B BBB

should not issue any news releases.

282.  Rossman immediately reported what Andrea Levine had communicated to her to Herman and Fehling.

283.  On or about November 12, 2003, Fehling again contacted Yost at the Denver, Colorado, Gannett news station, and gave Yost an interview relating to the NAD decision, during which Fehling mischaracterized the NAD decision, and falsely stated that the NAD decision gave validity to D/B BBB's purported concern that GENERAL STEEL's advertising was misleading.

284.  The NAD, in its decision, specifically recognized "that in its responses and presentation to the NAD, [GENERAL STEEL] did not only attempt to explain the reasoning behind its claims, it also exhibited a strong interest in and appreciation for the self regulatory process.  NAD appreciated [GENERAL STEEL's] apparent willingness to work within this self regulatory scheme to address any concerns related to its advertising."

285.  Yost omitted from his August 7, 2003 article on the Gannett Channel 9 website the NAD's commendation of GENERAL STEEL, and specifically referenced the fact that the D/B BBB was still giving GENERAL STEEL an unsatisfactory rating based on an unacceptable number of complaints, which in fact Yost had helped to generate with his August 6, 2003 interview with Fehling and subsequent article detailing the false and misleading statements made by Fehling.

286.  Fehling gave the November 12, 2003 interview to Yost relating to the NAD decision to indicate impropriety on the part of GENERAL STEEL, and to promote the D/B BBB.

287.  The Fehling interview with Yost was placed on the Gannett website, which also indicated that "Local BBB officials are pleased [with the NAD decision],"which gave additional promotional benefits to the D/B BBB, while concurrently damaging the image of GENERAL STEEL.

288.  In the website article, Yost mischaracterized a relevant part of the NAD decision in order to support Fehling's false claim that GENERAL STEEL's advertising was misleading because it omitted components such as doors and windows in its claim that its metal buildings were half the cost of conventional advertising.

289.  In truth and in fact, what the NAD decision held was that a consumer might assume that the "half the cost," also applied to the entire structure, including the foundation, and not just the materials supplied by GENERAL STEEL, and the NAD merely recommended that "this claim be modified to clearly and conspicuously identify the specific object of the advertiser's intended comparison."

290.  Herman did not prevent and encouraged the false dissemination of the NAD decision by Fehling in concert with Yost, which was done in order to promote the D/B BBB and Yost, and to foster negative sentiments against

64

GENERAL STEEL and to impugn GENERAL STEEL's reputation.

291.  The CBBB took no corrective action against the D/B BBB in response to Fehling's breach of the NAD/CARU/NARB participation agreement during the two interviews with Yost and condoned and acquiesced in Fehling's disregard of CBBB's policies.

292.  By November 24, 2003, the D/B BBB reliability report indicated a total of 68 complaints against GENERAL STEEL for the prior 36 month period. Of those 68 complaints, Fehling and Rossman fraudulently categorized 54 complaints as advertising, sales and delivery issues, listing 11 advertising complaints, 24 sales complaints, and 17 delivery issues.

293.  Customer service issues were whittled down to 2 complaints, and only one complaint was designated as credit or billing issue.  In a self-fulfilling statement, Fehling proclaimed in the November 24, 2003 reliability report, "Complaints are concerning advertising, delivery and sales issues."

294.  In the November 24, 2003, reliability report, notwithstanding that GENERAL STEEL had made a good faith effort to substantiate its advertising claims with the NAD, and the NAD decision finding that GENERAL STEEL's advertising was neither misleading nor deceptive, Fehling continued to indicate in the reliability report that "this company has failed to modify or substantiate advertising claims."  Fehling, in blatant disregard of the NAD decision and

GENERAL STEEL's willingness to modify its advertising to comply with NAD suggested changes, nonetheless also inserted in the November 24, 2003 reliability report that "The Bureau has requested the company to substantiate specific advertising claims concerning superiority claims, omission of extra charges, and cost savings claims.  The company has failed to provide an adequate response or modify claims."

295.  In the November 24, 2003, reliability report, Fehling and Rossman began to report that "General Steel Corporation does not manufacture steel buildings.  The company purchases buildings and sell to the public."  Fehling and Rossman thereby misrepresented GENERAL STEEL as a dealer/broker of manufactured buildings, when in fact it is a private label company who contracts with steel building manufacturers to manufacture GENERAL STEEL buildings in accordance with its own proprietary specifications.

296.  On information and belief, Simonson, Berkenkotter, and Puerta and Young, caused, acquiesced in, condoned, and encouraged Fehling and Rossman to include the false and damaging information that GENERAL STEEL was only a dealer/broker of steel buildings, in order to convey a false impression to the general public and to generate complaints for use in their lawsuits against GENERAL STEEL.

297.  Simonson and Berkenkotter and Puerta and Young used the

fraudulently manufactured complaints relating to advertising, sales, and delivery issues, the negative media attention generated by the disclosure of the confidential NAD proceedings by Fehling during the Yost interviews, to foment negative publicity against GENERAL STEEL, in preparation for their lawsuit against GENERAL STEEL alleging deceptive advertising and sales and delivery practices.

## II.   FACTS PERTAINING TO THE DESTRUCTION OF GENERAL STEEL'S BUSINESS RELATIONSHIP WITH ITS PRINCIPAL SUPPLIER, BY SIMONSON, LANGLEY, PUERTA AND AN UNNAMED DOE DEFENDANT.

298.  On or about December 16, 2003, Simonson, Puerta, Langley, and an unnamed female defendant, visited the offices of GENERAL STEEL's principal supplier, NCI, where they extensively interviewed GENERAL STEEL's primary contact with NCI, Ed Kohutek, about GENERAL STEEL's business transactions with NCI.

299.  NCI had a contract manufacturer relationship with GENERAL STEEL since GENERAL STEEL's inception in 1995.

300.  Langley took notes of the interview, which indicated that the defendants extensively questioned Kohutek about GENERAL STEEL's business relationship with NCI, including pricing and markup variables, the growth of GENERAL STEEL's business, the types of buildings manufactured by NCI  for GENERAL STEEL, GENERAL STEEL's advertising budget, and where it

advertises, and shipping and storage issues.

301.  The defendants learned during the course of their interview with Kohutek that one of the reasons that GENERAL STEEL was able to offer customers buildings at lower prices than its competitors was that it was able to negotiate favorable pricing with the manufacturers of its buildings.

302.  The defendants ignored this information, and continued to claim that GENERAL STEEL falsely advertised that it was offering low priced steel buildings to the public.

303.  During the interview, the defendants, state actors, maliciously and without any basis, discussed the possible federal criminal indictment of some or all of GENERAL STEEL officers and employees under the federal criminal Rico statute by the Sacramento DA's office with Kohutek.

304.  As a result of the defendants' communications with Kohutek that GENERAL STEEL personnel might be subject to criminal prosecutions, and had engaged in wrongdoing which might be subject to a criminal penalty, NCI refused to continue doing business with GENERAL STEEL.

III.       SALAZAR AND THE D/B BBB DEFENDANTS HERMAN
           FEHLING, ROSSMAN, AND TOSCANO, AND YOST DEFAMED
           AND  CONTINUE TO DEFAME GENERAL STEEL IN VIOLATION
                    OF ITS CONSTITUTIONAL RIGHTS.

305.  On January 16, 2004, Defendants Salazar and Simonson filed a lawsuit

in the Jefferson County District Court in Golden, Colorado, against GENERAL

STEEL alleging violations of the Colorado Consumer Protection Act.

306.  On January 16, 2004, Salazar gave a press conference in Denver,

Colorado, attended by all of the major news media in Denver, in which he defamed

GENERAL STEEL, and described GENERAL STEEL's advertising and sales of

its products as a "scheme [which was] very orchestrated and organized by the

GENERAL STEEL high-ups [*sic*]."

307.  On January 16, 2004, Salazar also appeared on the Denver, Colorado

KCNC-TV (CBS) Channel 4 News 4 at Five Show with Kathy Walsh, and

misrepresented GENERAL STEEL's business and made statements that were

untrue and not supported by fact, to wit: that GENERAL STEEL did not have an

inventory of buildings, did not have an inventory of overstock buildings, and could

not deliver buildings from its inventory at 50 percent off sales prices.

308.  On information and belief, Salazar made the false statements based on

false information given to him by Simonson and Langley, based on their interview

of the NCI representative, Ed Kohutek, on December 15, 2004.

309.  On January 21, 2004, Salazar also appeared on the Tom Martino Show,

a syndicated radio network broadcast, and actively discouraged consumers from

doing business with GENERAL STEEL.

310.  On a January 16, 2004, an article on the Gannett website Yost took

credit for the lawsuit filed by the Colorado AG defendants, and claimed the lawsuit

was a "follow-up to an I-Team Investigation."  In the January 16, 2004 website

article, that as of the date of the filing of this Complaint continues to be published

by Gannett, Yost recklessly gave the false impression that GENERAL STEEL only

informs consumers about the extra cost of components such as door and windows

after a customer agrees to the purchase price and sends in a deposit, when in fact

the purchase order presented by GENERAL STEEL to potential purchasers of its

buildings, that must be signed prior to making a deposit, advises purchasers that

they are only purchasing a main structure only, roof and sheeted walls, and

specifically excludes accessory items including, but not limited to, doors and

windows.

311.  Like the D/B BBB, the Colorado AG and the Sacramento DA

defendants, Yost did not investigate or compare the complaint records of

GENERAL STEEL's competitors, such as the affiliated companies, Fast Trac and

Panel Steel, against whom the combined complaints to the D/B BBB equaled or

exceeded that of GENERAL STEEL, yet whose volume of business was about one

third that of GENERAL STEEL's business.

312.  After the Colorado AG filed the lawsuit against GENERAL STEEL,

the D/B BBB defendants continued to work with the Colorado AG and the

Sacramento DA defendants to malign and injure GENERAL STEEL.

313.  Fehling inserted portions of the Colorado AG press release relating to the lawsuit against GENERAL STEEL in the D/B BBB "Government Action" section of GENERAL STEEL's reliability report, but did not give GENERAL STEEL an opportunity to state its position with respect to the pending charges against it, that was required by the CBBB Standard Reporting Language Manual, to ensure balanced, unbiased, and neutral reporting of a pending government action.

314.  Thereafter, when Fehling left the D/B BBB in April 2004, Herman and Toscano continued to direct and/or permit the Colorado AG lawsuit against GENERAL STEEL to be portrayed in the most disparaging, harmful, and biased way possible in the D/B BBB "Government Action" section of GENERAL STEEL's reliability report, without providing GENERAL STEEL with a prior opportunity to review the section or state its position with respect to the charges asserted against it, as required by the CBBB Standard Reporting Language Manual to ensure balanced, unbiased and neutral reporting of a pending government action.

315.  Moreover, after the first phase of the Colorado AG lawsuit concluded, and the Colorado AG defendants were seeking customers with complaints against GENERAL STEEL for the second phase of the trial, the Colorado AG defendants used the D/B BBB reliability reports of GENERAL STEEL to lobby GENERAL STEEL customers to participate in the second phase of the lawsuit.  Herman and

Toscano collaborated with the Colorado AG defendants and included telephone

numbers for customers both inside and outside of the State of Colorado to call and

make complaints.

316.  When the court in the Colorado AG lawsuit issued an order on August

12, 2005, that prohibited the lobbying by the Colorado AG's office of GENERAL

STEEL customers who may have had complaints against GENERAL STEEL to

participate in the second phase of the Colorado AG lawsuit, the D/B BBB ceased

its lobbying activities on behalf of the Colorado AG defendants, and, as set forth in

Section IV of this Complaint, the Colorado AG defendants recruited the New

Mexico AG defendants to continue lobbying customers of GENERAL STEEL in

violation of the court's anti-lobbying order.

317.  Beginning at or around January 21, 2004, Fehling and Rossman, and

thereafter, Toscano, began to include information relating to the NAD proceeding

in GENERAL STEEL's reliability reports, which mischaracterized the NAD case

decision.

318.  The defendants' mischaracterization of the NAD case decision and

negative portrayal of GENERAL STEEL both in the media and in its reliability

reports was and continues to be approved and condoned by the CBBB and Hunter.

319.  The Colorado AG defendants and the Sacramento DA defendants knew

of, agreed with, condoned, acquiesced in, and encouraged the D/B BBB's false and

fraudulent misrepresentations relating to GENERAL STEEL, in order to lobby more customers to participate in Phase II of the Colorado AG lawsuit and to lend credibility to the lawsuit which the Sacramento DA then was preparing to file.

320.  The defamatory, false statements and misrepresentations relating to GENERAL STEEL which were published by Salazar in his interviews with the media and press conferences, and which were published and continue to be published by the D/B BBB defendants, have caused injury and harm GENERAL STEEL's business.

## IV.    DEFENDANTS BERKENKOTTER, SIMONSON AND LANGLEY CONFEDERATE WITH THE BEERS AND JARVIS DEFENDANTS TO VIOLATE GENERAL STEEL'S CONSTUTIONAL RIGHTS

321.  The Beers Defendants contracted with GENERAL STEEL to purchase a steel building on or about April, 2003.

322.  After contracting with GENERAL STEEL for the purchase of a steel building, the Beers were seeking someone to erect the GENERAL STEEL building upon its delivery.  At that time, the Beers became aware of the 9News broadcast from the Yost and Gannett Defendants.

323.  The Beers then sought to unilaterally cancel and, thus, breach their contract and obtain return of all deposits funds paid to GENERAL STEEL.

324.  Upon failing to obtain return of their deposit funds, the Beers then asked their friend and Dana Beers' former business partner, Jarvis, to assist in

obtaining return of the Beers' deposits.

325.  On or about February 18, 2004, the Beers and Jarvis devised a plan to have Jarvis contact GENERAL STEEL and then falsely claim that the GENERAL STEEL salesperson had engaged in deceptive behavior.

326.  On information and belief, between February 18, 2004 and February 24, 2004, in order to further the Beers and Jarvis plan to wrongfully obtain Beers' deposits, the Beers and/or Jarvis then falsely informed the Colorado AG that Jarvis was the subject of deceptive practices during the conversation with GENERAL STEEL'S salespersons.

327.  In February, 2004, Defendants Berkenkotter and Simonson intended to seek a preliminary injunction against General Steel to further harm the conduct of GENERAL STEEL's business.

328.  Defendants Berkenkotter and Simonson knew that the Colorado AG would have to prove that GENERAL STEEL was engaged in ongoing deceptive conduct in order to obtain a preliminary injunction against GENERAL STEEL.

329.  Likewise, Defendants Berkenkotter and Simonson were aware that, for months, GENERAL STEEL had a state-of-the-art ethics compliance program in place to preclude such salesperson conduct and that GENERAL STEEL was not engaged in such conduct.

330.  Nevertheless, when Defendants Berkenkotter and Simonson became

aware that Jarvis claimed to have been the subject of deceptive practices, they were determined to have Jarvis testify by telephone to that effect at the preliminary injunction hearing.

331.  Defendant Langley interviewed Jarvis and Defendants Berkenkotter and Simonson disclosed Jarvis as a witness to the preliminary injunction hearing on February 26, 2004, just three (3) days prior to the hearing with an intervening weekend knowing that GENERAL STEEL would have no opportunity to conduct Jarvis' deposition.

332.  Defendants Berkenkotter, Simonson and Langley knew, should have known, were recklessly or deliberately indifferent to the fact that Jarvis would perjure himself by testifying at the preliminary injunction hearing that he had been the subject of GENERAL STEEL's deceptive practices.

333.  Nevertheless, Berkenkotter and Simonson, with Langley's assistance, called Jarvis as a witness to testify by telephone at the preliminary injunction proceedings.

334.  Jarvis testified falsely that he was seeking to obtain the price on a 50' x 80' x 18' steel building and was then subjected to various deceptive trade practices by a GENERAL STEEL'S salesperson.

335.  Defendants Berkenkotter, Simonson and Langley subsequently took no steps to remedy the above situation.

## V.   FACTS PERTAINING TO THE VIOLATION OF THE COLORADO DISTRICT COURT'S ANTI-LOBBYING ORDER.

336. On August 16, 2005, in the Colorado AG lawsuit, the court entered an order prohibiting the Colorado AG's office from lobbying customers of GENERAL STEEL to join Phase II of the action, in which customers were permitted individually to file claims against GENERAL STEEL.

337. On information and belief, at all times herein alleged with respect to the acts and conduct set forth in Section IV of this Complaint, defendants Berkenkotter, Simonson and McCallin directed, supervised, and condoned and acquiesced in the actions of any employees and agents of the Colorado AG's office who engaged in the conduct alleged herein, including, but not limited to, Brian Laughlin, a legal assistant. in the Colorado AG's office.

338. On information and belief, at all times herein alleged with respect to the acts and conduct set forth in Section IV of this Complaint, defendant Madrid directed, supervised, condoned, and acquiesced in the actions of any employees and agents of the New Mexico AG's office who engaged in the conduct alleged herein, including, but not limited to, Anita Wolff, a paralegal in the New Mexico AG's office.

339.  On or about November 2, 2005, defendant Madrid, the New Mexico Attorney General, issued a press release ("Madrid Press Release"), primarily

directed at churches who had purchased GENERAL STEEL church buildings, in

which she indicated that the Colorado AG's office had informed her office that

"one fourth of consumers from around the nation who were defrauded by

[GENERAL STEEL] were churches, each of which lost almost $10,000."

340.  The press release issued by Madrid exhorted New Mexico consumers

who "had been victimized by General Steel to immediately contact the Colorado

AG's office, and in bold print stated that "**Consumers defrauded by General

Steel between January 1, 2000 and March 1, 2004 have until November 19,

2005, to join the Colorado's lawsuit.**"

341.  The Madrid press release provided consumers with the telephone

number and address of the Colorado AG's office, and a contact person, Nancy

Bullis, and informed them that they could obtain complaint forms and the court's

order by accessing the Colorado AG's office website.

342.  Information relating to the number of churches who claimed to have

been defrauded by GENERAL STEEL was not privy to the general public and was

known only by the Colorado AG defendants and plaintiff herein.

343.  On information and belief, this information was provided to the New

Mexico defendants by the Colorado AG defendants through their agent and

employee, Brian Laughlin, in order to make an end run around the court order

prohibiting the Colorado AG defendants from lobbying GENERAL STEEL

customers to file complaints.

344.  The Colorado AG defendants solicited the New Mexico AG's office to make the November 2, 2005 press release, which also was published in a Colorado newspaper, because, contrary to the expectations of the Colorado AG defendants, the number of GENERAL STEEL customers who had actually filed claims to be heard in Phase II of the Colorado AG lawsuit was relatively few, when compared to the 7,000 claims envisioned by the Colorado AG defendants, and the November 19, 2005 deadline for joining consumers in Phase II of the Colorado AG lawsuit was fast approaching.

345.  On July 15, 2005, at the direction and under the supervision of defendants Simonson and Berkenkotter and McCallin, Brian Laughlin, a legal assistant or paralegal for the Colorado AG's office forwarded the opening and response briefs on Phase II of the Colorado actions to Anita Wolfe, a paralegal at the New Mexico AG's office.

346.  On or about October 20, 2005, Anita Wolff sent Laughlin an e-mail requesting that Laughlin fax a list of New Mexico consumers who fell outside of the March 2004 deadline.  Wolff also requested that Laughlin fax "a copy of the Judge's Order and letter as soon as possible, so we can get out a Press Release."

347.  On October 21, 2005, at 07:53 hours, Brian Laughlin e-mailed a response to Wolff's e-mail, referring to the August 16, 2005 court order relating to

Phase II of the Colorado AG lawsuit, and the letter to consumers written by the judge in that action, which Laughlin had faxed to Wolff.

348.  In the October 16, 2005 e-mail, Laughlin specifically pointed out that the "judge wrote the letter we sent out," and denigrated the judge by stating that "the judge seemed to buy into General Steel's due process arguments and ordered depos and hearings for all consumers who respond * potentially 7000!"

349.  Laughlin also advised Wolff that she would see in the "order that the Judge has limited our contact with consumers, and we now have to tape all calls with consumers and turn those over to General Steel.  So we can't give direct [*sic*] people on what to do."

350.  Laughlin's October 21, 2005 e-mail also informed Wolff that "We have been telling all consumers that if they have some question as to whether or not they are covered by this, they should file a response in writing with us.  And we are telling all consumers with prior complaints the same thing.  We have no direction from the [*sic*] about these consumers, and will certainly argue that the earlier complaints are sufficient, but you can image that General steel [*sic*] won't see it the same way."

351.  In his October 21, 2005 e-mail to Wolff, Laughlin clearly was soliciting help from Wolff and the  New Mexico AG's office in circumventing and, therefore, violating, the court's August 16, 2005 order in the Colorado AG lawsuit,

and in dealing with new complaints not covered by the Colorado AG lawsuit.

352. The Madrid press release also contained numerous false statements and mischaracterizations of the church buildings sold by GENERAL STEEL, and described the buildings as a metal box, when in fact GENERAL STEEL church buildings were and are designed by a licensed architect, and the judge in the Colorado AG lawsuit had noted in his Findings relating to Phase I of the Colorado AG lawsuit that the "buildings sold by General Steel are of good quality."

353. The Madrid press release also falsely stated that "[i]n most cases, the company doesn't disclose that the quoted construction price of these metal buildings does not include the installation of doors and windows, which are charged at a hefty price."

354. In truth and in fact, all purchase orders presented by GENERAL STEEL to potential purchasers of its buildings who have not specifically requested additional building components, and which must be signed prior to making a deposit, advise purchasers that they are only purchasing a main structure only, roof and sheeted walls, and specifically excludes accessory items including, but not limited to, doors and windows.

355. The Madrid press release omitted any mention of the fact that GENERAL STEEL had implemented a program in March 2004 to monitor its sales people, and to prevent any misrepresentations, and instead falsely depicted the

sales practices which GENERAL STEEL itself voluntarily chose to monitor and correct in March 2004, as being current and ongoing.

356.  In the Madrid press release, Madrid makes the assumption, without any factual basis, that customers of GENERAL STEEL had been "victimized" and "defrauded," and the unqualified use of such words was intended to encourage nonexistent complaints, including spurious complaints by disgruntled customers of GENERAL STEEL who simply wished to renege on their contracts because they had changed their minds.

357.  The Madrid press release was intentionally, recklessly and deliberately indifferently published in order to harm GENERAL STEEL's business in New Mexico, and to increase the volume of complaints filed in Phase II of the Colorado AG lawsuit, and to discourage consumers from purchasing GENERAL STEEL buildings.

358.  The Madrid press release also referred GENERAL STEEL customers to the D/B BBB, because Madrid and Wolff knew that the D/B BBB handled all complaints relating to GENERAL STEEL, and that the D/B BBB reliability reports pertaining to GENERAL STEEL were defamatory and contained adverse information that would both persuade customers of GENERAL STEEL to file claims in Phase II of the Colorado AG lawsuit, and/or to dissuade new customers from doing business with GENERAL STEEL.

81

359.  On or about November 7, 2005, GENERAL STEEL filed a motion for remedies, sanctions and expedited discovery based on the Colorado AG Defendants' violation of the Phase II Order's anti-lobbying provision in the Colorado action.

360.  Defendant Berkenkotter filed an opposition to GENERAL STEEL's motion in the Colorado action and attached to it the sworn affidavit of Anita Wolff, that defendant Berkenkotter prepared for Anita Wolff.  In that sworn affidavit, Anita Wolff perjuriously stated that she learned about the upcoming deadline in the Colorado action from a New Mexico consumer who had called her on October 21, 2005.

361.  In truth and in fact, on October 20, 2005, Wolff already had e-mailed Laughlin to request that he send her a "list of N.M. people who fall outside the March 2004 deadline as soon as possible, and also requesting a copy of the "Judge's Order and letter [in the Colorado action] as soon as possible, so we can get out a Press Release."

362.  Laughlin responded with his October 21, 2005, e-mail and a copy of the August 16, 2005 court order and judge's letter, as set forth above.

363.  Thus, clearly the hasty publication of the Madrid press release on November 2, 2005, was to aid the Colorado AG defendants in soliciting additional complaints prior to the November 19, 2005 deadline, for Phase II of the Colorado

AG lawsuit, in violation of the judge's order.

364.  Nowhere in the sworn affidavit of Wolff is the correspondence between Wolff and Laughlin set forth.

367.  In her sworn affidavit, Anita Wolff expressly denies that the Colorado AG's office played any role in the issuance of the Madrid press release.

368.  Also in her sworn affidavit, Anita Wolff expressly states that "No one at the Colorado Attorney General's Office asked anyone at the New Mexico Attorney General's Office, directly or indirectly, to issue a press release concerning General Steel."

369.  In an e-mail dated November 10, 2005, from Berkenkotter to Wolff, to which Berkenkotter attached a new draft of the Wolff affidavit, Berkenkotter quotes Wolff's statements in a telephone conversation, to wit, "You don't know what Phase II is -- that it is more accurate to say you learned of a deadline from a consumer . . ."  In truth and in fact, this was a complete fabrication because Wolff knew of and was aware of Phase II of the Colorado action as early as July 15, 2005, when Laughlin forwarded the Colorado AG defendants' briefs on Phase II of the Colorado action.

370.  Berkenkotter caused the perjurious Wolff affidavit to be filed in the Colorado action, although, on information and belief, she knew, or should have known of the Laughlin-Wolff communications and that Wolff had been fully

apprised by Laughlin of the anti-lobbying provision of the court's August 16, 2005 order.

371.  At a November 15, 2005 hearing on the sanctions motion filed by GENERAL STEEL in the Colorado AG lawsuit based on the violation of the sanctions order by the Colorado AG Defendants, Defendant Berkenkotter categorically denied that anyone associated with the Colorado attorney general's office had done anything to encourage anyone to solicit consumers to submit their complaints before the deadline.

372.  Instead, Berkenkotter corroborated Wolff's false affidavit by stating that a customer who had contacted the New Mexico AG's office about "some type of complaint, wanted to know if they also needed to file a complaint with New Mexico," and that Berkenkotter spoke with the person from the New Mexico AG's office and referred them to the Colorado AG's website.

373.  Berkenkotter also told the court that "paralegals in our office don't have the authority to be talking to anybody about press releases," notwithstanding that she knew or should have known that Laughlin, a legal assistant/paralegal had responded to Wolff's October 20, 2005 e-mail requesting assistance with the New Mexico press release and copies of the court's order and letter to consumers, and an e-mail seeking Wolff's assistance in violating the August 16, 2005 order.

374.  The court in the Colorado action relied on the perjurious Wolff

affidavit and Berkenkotter's false representations to the court in finding no violation of its anti-lobbying order.

## VI.  FACTS PERTAINING TO THE THEFT OF GENERAL STEEL'S PROPRIETARY INFORMATION BY DEFENDANTS MORGENTHALER, DONAHUE, AND MCKENNA, AND THE RECEIPT AND USE OF SAID STOLEN PROPERTY BY THE COLORADO AG AND THE SACRAMENTO DA'S OFFICE

375.  Donahue, Morgenthaler and McKenna were employees of GENERAL STEEL who left GENERAL STEEL in July 2004 to establish and/or work in a competing steel building company, known as Steelwise L.L.C. ("Steelwise"), which was formed by defendant Donahue in late July 2004.

376.  As a condition of their employment with GENERAL STEEL, each of said defendants was required to sign an agreement containing a covenant not to compete, and that also included non-disclosure and non-solicitation covenants.

377.  The non-compete agreement was signed by Morgenthaler in 2001.

378.  On information and belief, Donahue signed the non-compete agreement, but because Morgenthaler was in charge of maintaining non-compete agreements and because Morgenthaler and Donahue knew they were going to leave GENERAL STEEL in order to set up a competing steel company, Donahue's non-compete agreement was either hidden, destroyed or discarded by Donahue and/or Morgenthaler.

379.  Defendant McKenna was hired by Donahue to work at GENERAL STEEL in June 2004, and was not made to sign a non-compete agreement with GENERAL STEEL.

380.  From December 2000 to July 15, 2004, Morgenthaler was employed by GENERAL STEEL, first in sales, and subsequently as GENERAL STEEL's operations manager and corporate compliance officer.

381.  From May 29, 2003 to July 29, 2004, Defendant Donahue was employed by GENERAL STEEL as its chief financial officer.

382.  After Donahue was hired to work as the chief financial officer at GENERAL STEEL, he became Morgenthaler's immediate supervisor, and the two interacted on a daily basis.

383.  As a senior-level corporate officer and as operations manager, respectively, Donahue and Morgenthaler, individually and collectively, had access to proprietary, confidential corporate marketing and financial data relating to GENERAL STEEL's market strategy, sales training methods, pricing, and internal financial and operations data.

384.  As chief financial officer, Donahue had access to GENERAL STEEL's accounting records and interacted with GENERAL STEEL's accountant.

385.  Prior to working at GENERAL STEEL, Donahue had never worked for a company that was in the steel building industry, and derived all of his

knowledge of the steel building industry from his employment at GENERAL STEEL.

386.  Donahue was terminated for cause by GENERAL STEEL on July 29, 2004, but was planning to leave GENERAL STEEL on July 30, 3004, because Donahue had already formed the competing steel building company that came to be known as Steelwise.

387.  As a part of his employment, first in sales, and thereafter as an operations manager at GENERAL STEEL, Morgenthaler had priced steel buildings in sales, and in his capacity as an operations manager, had created pricing guides for the sales personnel at GENERAL STEEL.

388.  Morgenthaler knew that sales pricing guides were GENERAL STEEL's confidential and proprietary work product.

389.  Also as operations manager in 2003 and 2004, Morgenthaler was involved in a marketing project which included developing graphics for use in marketing GENERAL STEEL's church buildings and other steel buildings.

390.  An architect was utilized for this purpose, and said architect designed approximately 50 churches and buildings, and said designs and graphics became the proprietary work product of GENERAL STEEL.

391.  In or about 2003, Morgenthaler was asked by the president and chief executive officer of GENERAL STEEL, Jeffrey Knight, to set up a church

financing plan, and Morgenthaler, in the course and scope of his employment with GENERAL STEEL, located an entity who provided financing for church projects known as the California Plan for Church Finance ("CPCF").

392.  Beginning in March 2004, Morgenthaler began to have discussions with Donahue about setting up a steel building company.

393.  Based on his discussions with Donahue, in or about April 2004, while Morgenthaler was still an employee of GENERAL STEEL, Morgenthaler began to prepare a business plan for a steel building company, and that plan was used to establish Steelwise.

394.  Also based upon his discussions with Donahue, in or around March 2004, Morgenthaler took a day off from his employment at GENERAL STEEL and had telephonic discussions with a steel building manufacturer, NCI, that had previously been the primary supplier of GENERAL STEEL.

395.  In or about April 2004, Morgenthaler and Donahue met with employees of NCI and another supplier of GENERAL STEEL, Nucor, for the purpose of obtaining information relating to the manufacture of steel buildings, but did not disclose to the employee of Nucor with whom they met that they were employed by GENERAL STEEL.

396.  After its formation, Steelwise used NCI to manufacture the steel buildings that it sold.

397.  On or about April 8, 2004, for the purpose of setting up a competing steel building company, Morgenthaler and Donahue began to purloin information relating to GENERAL STEEL's pricing structure, including spreadsheets containing confidential pricing information, that had been prepared for Jordan Blum, GENERAL STEEL's vice president in charge of negotiating pricing with GENERAL STEEL suppliers.

398.  GENERAL STEEL's ability to negotiate favorable pricing with its suppliers enables it to offer low-priced steel buildings to its customers, and its negotiations with suppliers and confidential pricing information relating to its suppliers, are closely guarded confidential and proprietary information of GENERAL STEEL.

399.  On or about May 3, 2004, Morgenthaler provided Donahue with a GENERAL STEEL Colorado customer detail list for use by Steelwise, that was confidential proprietary information prepared for GENERAL STEEL attorneys, and that Morgenthaler understood was prepared for GENERAL STEEL attorneys.

400.  In or about June 2004, Donahue provided Morgenthaler with confidential pricing information and negotiations with a steel building supplier of GENERAL STEEL, who also was used by Morgenthaler in setting up the steel building company that came to be known as Steelwise.

401.  On or about July 21, 2004, while defendant Donahue was still

employed by GENERAL STEEL as its chief financial officer, Donahue formed a company with the purpose of directly competing with GENERAL STEEL, to whom Donahue gave the name Steelwise, LLC.

402.  In or about July 2004, defendant Donahue asked Morgenthaler to leave GENERAL STEEL's employ in order to be employed by the steel building company Donahue was in the process of forming, and Morgenthaler agreed.

403.  On or about July 15, 2004, Morgenthaler resigned from GENERAL STEEL and falsely told GENERAL STEEL employees that he had obtained employment with a mortgage company.

404.  On or about August 4, 2004, Morgenthaler entered into an agreement with Sprint to provide telephone service for Steelwise, but surreptitiously listed the customer as "E. Morgenthaler and Associates."  The Sprint bills were paid by Steelwise, and the Steelwise.com domain name was acquired on approximately July 29-30, 2004.

405.  Approximately seven computers paid for by Steelwise also were purchased by the entity E. Morgenthaler & Associates.

406.  In or about July 8, 2004, Donahue hired Tim McKenna to work at GENERAL STEEL.  Donahue had a previous business and social relationship with Tim McKenna having been his supervisor at four different companies over eight or more years.

407.  Donahue caused Tim McKenna to learn the job functions of employees in GENERAL STEEL's accounting department, including the job functions of the accounts receivables analyst and the account reconciliation analyst, so that McKenna could use the training he had received at GENERAL STEEL to perform similar functions at Steelwise.  Donahue had gone so far as to instruct McKenna to "not let on" that they knew each other so McKenna could get the job at General Steel in order to learn the accounting department job functions. Donahue told McKenna not to disclose that they knew each other because General Steel's owner [Mr. Knight] had a policy whereby he would not hire friends or colleagues of employees.  McKenna agreed to not disclose his relationship with Donahue and accordingly intentionally omitted a prior employment from his written job application with General Steel in order to "not let on" that he and Donahue knew each other.

409.  On or about July 27, 2004, McKenna left GENERAL STEEL and advised employees at GENERAL STEEL that he was leaving to take a few days off because his wife just had a baby.  When he left for "a few days off," however, McKenna packed up all of his personal belongings and took them with him. McKenna never came back to GENERAL STEEL, and a week later telephoned GENERAL STEEL to tell them that he had taken a position in a high-tech company.

410.  In truth and in fact, once he was sufficiently trained by GENERAL STEEL's accounting department employees, McKenna left GENERAL STEEL at the behest of Donahue in order to work at Steelwise and to utilize the training and information gained at GENERAL STEEL, in order to set up accounting operations at Steelwise.  In fact, McKenna spent most or all of his three week employment at GENERAL STEEL learning the various accounting jobs.  Within two or three days of leaving GENERAL STEEL purportedly because of his new baby, McKenna went to work for Donahue and Steelwise.

411.  In or about August 2004, Steelwise contacted the architect who had designed the graphics for GENERAL STEEL in 2003 and 2004, and duped the architect into providing it with drawings of churches and homes designed by the architect for GENERAL STEEL in 2003 and 2004. Steelwise then removed GENERAL STEEL's name and trademarked logo from the key drawings and put its own Steelwise name on the drawings.  Steelwise then routinely faxed these drawings to prospective church clients.

412.  As a result of the use of the propriety work product drawings belonging to GENERAL STEEL, Steelwise has sold buildings to churches.

413.  Also as a result of information acquired by Morgenthaler in the course and scope of his employment at GENERAL STEEL, Steelwise has referred potential church building purchasers to the CPCF, and to the person Morgenthaler

dealt with while he was employed at GENERAL STEEL, to finance the purchase of church buildings.

414.  Donahue and Morgenthaler used information acquired in the course and scope of their employment with GENERAL STEEL to designate states in which GENERAL STEEL sells buildings, to be targeted for sales by Steelwise.

415.  Steelwise utilizes a direct mail card created and copyrighted by GENERAL STEEL to create direct mail cards for Steelwise that was virtually identical in size, design, and language to GENERAL STEEL's direct mail cards.

416.  The direct mail cards created by Steelwise include language indicating that buildings can be constructed "up to 50 percent less than conventional construction," that was virtually identical to the language on GENERAL STEEL's direct mail cards, which read "Save up to 50 percent compared to the cost of conventional construction," but has none of the disclaimers included on the direct mail cards of GENERAL STEEL, pursuant to the NAD ruling.

417.  In or about June 2004, in his capacity as an employee of GENERAL STEEL, Morgenthaler was assigned by Donahue, pursuant to a request by GENERAL STEEL CEO and president Jeffrey Knight, to prepare a spreadsheet indicating a breakdown of the amount of customer deposits on buildings that had not yet been delivered, for customers in the State of California.

418.  Morgenthaler was advised by Donahue and understood that the

information request by Mr. Knight was to be prepared for a legal purpose, and knew also that it was proprietary information protected as a GENERAL STEEL trade secret.

419.  The spreadsheet that Mr. Knight requested that Donahue cause Morgenthaler to prepare was for use by GENERAL STEEL's attorneys, who were representing GENERAL STEEL in negotiations with the Sacramento DA's office, which was threatening legal action against GENERAL STEEL, based on the false and fraudulent information said defendants had acquired from the D/B BBB and the Colorado AG's office.

420.  Without the knowledge or consent of Mr. Knight or any of GENERAL STEEL's agents or employees, except Donahue, Morgenthaler prepared an Excel spreadsheet containing a database of all of GENERAL STEEL customers throughout the United States, by downloading information, from two GENERAL STEEL computer software programs, that contained proprietary trade secret information relating to customers in each of the states in which GENERAL STEEL had customers, onto the computer Morgenthaler used at GENERAL STEEL.

421.  Morgenthaler then prepared a spreadsheet which separated out customers in the state of California, that he gave to Mr. Knight for use by GENERAL STEEL's attorneys in California, and, without the knowledge or consent of any agent or employee of GENERAL STEEL, except Donahue, kept the

comprehensive trade secret database he had downloaded on his computer.

422.  When Morgenthaler left GENERAL STEEL, he copied the entire "My Documents" file on his computer at GENERAL STEEL that included the Excel spreadsheets containing the GENERAL STEEL comprehensive trade secret data base, and he absconded with it.

423.  Morgenthaler made the unauthorized, stolen copy of the database protected as a trade secret in order to utilize the data for Steelwise marketing purposes and also in order to damage and/or destroy GENERAL STEEL's business, by furthering the prosecution of GENERAL STEEL by the Colorado AG and the Sacramento DA defendants.

424.  In or about early August 2004, after Morgenthaler left GENERAL STEEL, Morgenthaler made a CD-ROM of the Excel spreadsheet he had stolen containing the GENERAL STEEL privileged, comprehensive trade secret data base, that he then gave to Simonson.

425.  Simonson and Berkenkotter knew the CD-ROM contained a data base prepared for use by GENERAL STEEL's attorneys by Morgenthaler in the course and scope of his employment with GENERAL STEEL, and therefore knew that Simonson was receiving stolen property.

426.  Simonson and Berkenkotter also knew that Donahue and Morgenthaler had left GENERAL STEEL to start up a competing steel building business,

Steelwise, and that their only motive for contacting Simonson and providing him with GENERAL STEEL's proprietary trade secrets was to damage/destroy GENERAL STEEL's business so that Steelwise could take over the GENERAL STEEL's market share of the steel building industry.

427.  Simonson and Berkenkotter also knew that the CD-ROM contained information protected by the Colorado Uniform Trade Secrets Act, C.R.S. § 7074-101 to 110.

428.  Further, Simonson and Berkenkotter knew that Morgenthaler had stolen the data contained on the CD-ROM for use in marketing Steelwise products.

429.  Nonetheless, later in August 2004, defendant Simonson met with both Morgenthaler and Donahue in order to discuss the contents of the CD-ROM containing GENERAL STEEL's privileged, trade secrets materials stolen by Morgenthaler.  Defendant Simonson, thereafter, contacted Donahue on several occasions for the purpose of obtaining more information about the financial data on the spreadsheet.  Defendant Donahue provided this information repeatedly, despite claiming to have reviewed the spreadsheet only once for less than an hour at Morgenthaler's house.  Defendant Donahue repeatedly provided inaccurate and unsubstantiated information about the spreadsheet to Defendant Simonson. Defendant Morgenthaler made extensive mistakes in preparing the spreadsheet and in inputting formulas in Excel document.  Defendant Donahue did nothing to check

or review or otherwise correct any of the grossly inaccurate financial information and totals in the spreadsheet.  Defendant Donahue, nonetheless, repeatedly gave Defendant Simonson information about the spreadsheet and General Steel's finances either intentionally or recklessly so as to harm GENERAL STEEL.

430.  Defendant Donahue also stole privileged accountant-client tax information belonging to GENERAL STEEL that he gave to Simonson solely in order to damage GENERAL STEEL and without any basis in law or fact that GENERAL STEEL had committed any unlawful act with respect to the privileged tax information.

431.  However, Simonson, who could not use privileged tax information that Donahue stole from GENERAL STEEL, and without any basis in fact or law to believe that GENERAL STEEL had committed any unlawful act, passed the information stolen by Donahue along to the Colorado Department of Revenue and/or contacted the Colorado Department of Revenue to further the act of damaging GENERAL STEEL and requested that the Colorado Department of Revenue contact Donahue.

432.  The Colorado AG defendants, Simonson and Berkenkotter, knew or should have known, that Donahue and Morgenthaler, by discussing the information contained on the CD-ROM, were divulging confidential trade secrets of GENERAL STEEL and that their communications relating to GENERAL STEEL

were in breach of an express or implied nondisclosure agreement.  Indeed,

Donahue claims he never signed a nondisclosure agreement with General Steel, but

admits that he supervised Morgenthaler who was in charge of ensuring that *every*

employee at General Steel had signed a noncompete, nondisclosure, and

confidentiality agreement.

433.  Donahue misrepresented to Simonson that the database represented

$14.7 million in forfeited deposits of GENERAL STEEL customers, when in fact

the database included several categories unrelated to forfeited deposits, and

contained numerous duplicate entries, that Morgenthaler included to inflate the

figures on forfeited deposits.

434.  When the acquisition of the CD-ROM containing GENERAL

STEEL's proprietary information by Simonson and Berkenkotter was brought to

the attention of the court in the lawsuit filed in Colorado against GENERAL

STEEL by the Colorado AG's office, Simonson falsely represented to the court

that the CD-ROM was obtained by a disgruntled whistleblower, and did not tell the

court that Morgenthaler had stolen the trade secrets database in order to set up a

competing company and to help destroy GENERAL STEEL's business, even

though he knew that Morgenthaler was employed by Steelwise, a competitor of

GENERAL STEEL.

435.  Because the principal part of the Colorado AG's lawsuit against

GENERAL STEEL had been concluded in a stipulated injunction, Simonson was unable to utilize the information contained on the CD-ROM in the lawsuit filed by the Colorado AG's office against GENERAL STEEL.

436.  Therefore, on information and belief, Simonson gave a copy of the CD-ROM containing the stolen proprietary information belonging to GENERAL STEEL to the Sacramento DA defendants, Puerta and Young, and arranged for Donahue to discuss the information on the CD-ROM with said defendants.

437.  The Sacramento DA defendants, Scully, Puerta and Young, knew that Donahue had set up a competing steel business with GENERAL STEEL and that his motive was to injure/destroy the business of GENERAL STEEL, so that Steelwise could take over GENERAL STEEL's market share of the steel building industry and therefore that his interpretation of the stolen Excel spreadsheet database was suspect and replete with misrepresentations relating to the nature and content of the data contained on the Excel spreadsheet, and was made only to further his own corrupt business purpose.  Indeed, far from being a whistleblower, it has now been learned that Donahue committed serious loan fraud and fraud upon the Small Business Administration of the federal government in obtaining an SBA Loan in October 2004.

438.  The Sacramento DA defendants, Scully, Puerta and Young, also knew that the CD-ROM contained trade secrets of GENERAL STEEL had been stolen

by Morgenthaler while he was employed by GENERAL STEEL, and that

Morgenthaler had left GENERAL STEEL in order to work for Steelwise, and

therefore knew they were receiving stolen property.

439.  The Sacramento DA defendants, Scully, Puerta and Young, knew that

Donahue, by discussing the purloined information contained on the CD-ROM was

divulging, privileged, confidential trade secrets of GENERAL STEEL, and that his

communications relating to GENERAL STEEL were in breach of an express or

implied nondisclosure agreement.

440.  The Sacramento DA defendants, Scully, Puerta and Young, knew that

Donahue was not a whistleblower who had an interest in protecting the public but

instead that his only motive was to acquire any and all of GENERAL STEEL's

market share of the steel building industry, and said defendants actively furthered

defendant Donahue's attempted acquisition of GENERAL STEEL's market share

by their investigation and prosecution of GENERAL STEEL.

441.  On August 22, 2005, Sacramento DA defendant Scully and Young

filed an action against GENERAL STEEL, Mr. Knight and several of its

employees, as well as its affiliated companies, in the Sacramento County Superior

Court, in Sacramento, California, alleging violations of California consumer

protection laws, including engaging in unfair competition, unlawful, fraudulent

and/or unfair business conduct.  The defendants also claimed that GENERAL

STEEL had engaged in deceptive and misleading advertising, notwithstanding the NAD decision to the contrary.

442. On November 15, 2005, notwithstanding that Young knew that defendant Donahue had acquiesced in and encouraged the theft of GENERAL STEEL's privileged, proprietary trade secret data base by Morgenthaler for use by Steelwise, and that Donahue had himself stolen privileged accounting records belonging to GENERAL STEEL, and that defendant Donahue had set up a company that utilized the stolen information and data base to market its competing products, and that it was in Donahue's interest to harm and destroy GENERAL STEEL, Young caused Donahue to file a false and perjurious declaration in the action filed by the Sacramento DA's office.

443. Nowhere in his declaration does Donahue indicate that his own business, Steelwise, targets GENERAL STEEL customers in California with its advertising.

444. Nowhere in his declaration did Donahue indicate that Steelwise's direct mail advertising is a mirror image of GENERAL STEEL's direct mail advertising and that it was copied from GENERAL STEEL's direct mail advertising, but that it excludes all of the disclaimers included GENERAL STEEL's direct mail cards, pursuant to its voluntary agreement with the NAD.

445. There is no indication in Donahue's declaration that Donahue is a

direct competitor of GENERAL STEEL.  All Donahue states is that "I am currently self-employed in the steel building industry," that is deceptive and designed to give the false impression that he is disinterested and unbiased.

446.  Donahue's declaration includes false statements, as well as proprietary information relating to GENERAL STEEL that Donahue and Young derived from the CD containing proprietary trade secrets of GENERAL STEEL which Morgenthaler stole from GENERAL STEEL.

447.  Donahue had no responsibility for or direct knowledge of GENERAL STEEL sales scripts, and his description of GENERAL STEEL's sales scripts and business practices is false and perjurious in that it is not based on personal knowledge.

448.  In truth and in fact, Scully and Young, in their prosecution of GENERAL STEEL, were promoting unfair competition, and unlawful, fraudulent and/or unfair business conduct on the part of Donahue, Morgenthaler, and Steelwise, and were aiding Herman's effort to destroy GENERAL STEEL's business and promote that of Wedgcor and its affiliated companies.

## COUNT ONE

(Against All Defendants, 42 U.S.C. § 1983, Equal Protection,)

449.  At the times of the incidents and conduct alleged in this case, set forth immediately hereinabove, the rights of persons within the jurisdiction of the United

States of America under the Fourteenth Amendment to the United States Constitution to equal protection and treatment under the laws were in force and effect, and defendants and each of them were deliberately indifferent to plaintiff's Fourteenth Amendment rights, and, by virtue thereof, each defendant is liable to plaintiff for compensatory and punitive damages as set forth in the prayer hereinbelow.

## COUNT TWO

(Against All Defendants, 42 U.S.C. § 1983, Due Process)

450.  At the times of the incidents and conduct alleged in this case, set forth immediately hereinabove, the rights of persons within the jurisdiction of the United States of America under the Fourteenth Amendment to the United States Constitution to due process of law and not to be deprived of liberty or property without due process of law were in force and effect, and defendants and each of them were deliberately indifferent to plaintiff's Fourteenth Amendment rights, and, by virtue thereof, each defendant is liable to plaintiff for compensatory and punitive damages as set forth in the prayer hereinbelow.

## COUNT THREE

(Against All Defendants, 42 U.S.C. § 1983, Conspiracies)

451.  Also, it is alleged that there were agreements and/or understandings between and/or among all defendants to engage in the conduct alleged herein to be wrongful, and that there were the commission of overt acts in furtherance of said conspiracy, as set forth hereinabove.

## COUNT FOUR

(Against All Defendants, The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961, *et seq.*)

452.  The Colorado AG's office, the Sacramento DA's office, the DB BBB, the CBBB, STEELWISE, the New Mexico Attorney General's Office each and all are enterprises within the meaning of 18 U.S.C. § 1961(4), and together each of these entities constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

453.  The activities of the of each and all of these enterprises, as well as the activities of all of them together as a separate enterprise, affect interstate commerce.

454.  Defendants acquired and/or maintained control over said enterprises through a pattern of racketeering activities, in violation of 18 U.S.C. 1962(b).

455.  Defendants, being associated with said enterprises, conducted and/or participated in said enterprises' affairs through patterns of racketeering activities, in violation of 18 U.S.C. 1962(c).

456.  The patterns of racketeering activities included a continuous pattern and practice involving all of the activities set forth in full hereinabove, and involved attempted extortion and extortion and bribery, chargeable under state law as felonies punishable for more than one year in prison.

457.  The patterns and practices of racketeering activities also included numerous acts of mail fraud and wire fraud punishable as felonies under federal law, respectively 18 U.S.C. §§ 1341 and 1343.

458.  Plaintiff and others were injured in their businesses, employments, employment opportunities, and/or property by reason of the conduct set forth.

459.  Defendants unlawfully have engaged in the racketeering activities set forth in the preceding averments and, on information and belief, on at least two occasions during the last, past 10 years, through a pattern of racketeering activity, and have acquired directly and indirectly control of the named enterprises, who have engaged in and whose activities affect interstate commerce.

460.  Defendants, who either are employed by or who are associated with those racketeering enterprises, have conducted those enterprises through a pattern of racketeering activity, as set forth hereinabove.

## COUNT FIVE

(Against All Defendants For Conspiracy To Violate Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. 1962[d])

461.  Defendants unlawfully have conspired, as set forth hereinabove, to violate the provisions of 18 U.S.C. 1962(b), (c), and (d).

462.  Plaintiff and others all were injured in their businesses or property by reason thereof, and plaintiff is entitled to damages, to be trebled.

**WHEREFORE**, plaintiff requests relief against each defendant as follows:

l.  General damages in the sum of $500,000,000.00;

2. Punitive damages against each defendant in the sum of $500,000,000.00;

3. Damages of $500,000,000.00, to be trebled on the RICO claims against each defendant;

4.  Interest from the date of the wrongful conduct;

5.  Costs of suit, including attorneys' fees; and,

6.  Such other relief as may be warranted or as is just and proper.

### JURY DEMAND

Trial by jury of all issues is demanded.

**YAGMAN & YAGMAN & REICHMANN**
**MARION R. YAGMAN**
**STEPHEN YAGMAN**

By: _____
　　　**STEPHEN YAGMAN**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28